# United States Court of Appeals for the Federal Circuit

---

**AD HOC SHRIMP TRADE ACTION COMMITTEE,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**HILLTOP INTERNATIONAL, OCEAN DUKE CORP.,**
*Defendants-Appellants*

---

2014-1514

---

Appeal from the United States Court of International Trade in No. 1:11-cv-00335-DCP, Senior Judge Donald C. Pogue.

---------------------------------------------------------------------

**AD HOC SHRIMP TRADE ACTION COMMITTEE,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**HILLTOP INTERNATIONAL, OCEAN DUKE CORP.,**
*Defendants-Appellants*

————————————

2014-1647

————————————

Appeal from the United States Court of International Trade in No. 1:10-cv-00275-DCP, Senior Judge Donald C. Pogue.

————————————

Decided: October 5, 2015

————————————

NATHANIEL RICKARD, Picard Kentz & Rowe LLP, Washington, DC, for plaintiff-appellee. Also represented by ANDREW WILLIAM KENTZ.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, PATRICIA M. MCCARTHY; MELISSA M. BREWER, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

MARK PARDO, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Washington, DC, argued for defendants-appellants. Also represented by ANDREW THOMAS SCHUTZ.

ALAN H. PRICE, Wiley Rein, LLP, Washington, DC, for amicus curiae Nucor Corporation. Also represented by TIMOTHY C. BRIGHTBILL.

————————————

Before REYNA, CLEVENGER, and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellants Hilltop International and Ocean Duke Corp. (collectively, "Hilltop") appeal the decisions of the United States Court of International Trade ("CIT") affirming the United States Department of Commerce's ("Commerce") determination that Hilltop is ineligible for an antidumping duty rate separate from the country-wide entity and its selection of the country-wide rate. *See Ad Hoc Shrimp Trade Action Comm. v. United States* (*Ad Hoc Shrimp II*), 992 F. Supp. 2d 1285 (Ct. Int'l Trade 2014); *Ad Hoc Shrimp Trade Action Comm. v. United States* (*Ad Hoc Shrimp I*), 925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013). Because Commerce's determinations were supported by substantial evidence and were not otherwise contrary to law, this court affirms.

BACKGROUND

I. Facts and Proceedings

These appeals involve the Fourth and Fifth Administrative Reviews[1] of the antidumping duty order covering

---

[1] Appeal No. 2014-1647 involves the appeal of Commerce's determinations in the Fourth Administrative Review (CIT Docket No. 10-275), while Appeal No. 2014-1514 involves the appeal of Commerce's determinations in the Fifth Administrative Review (CIT Docket No. 11-335). The CIT sustained Commerce's findings regarding Hilltop's separate rate status and the calculation of the country-wide rate for the Fourth Review in *Ad Hoc Shrimp II*, 992 F. Supp. 2d 1285. For the Fifth Review, the CIT sustained Commerce's findings regarding Hilltop's separate rate status in *Ad Hoc Shrimp I*, 925 F.

certain frozen warmwater shrimp ("subject merchandise") from the People's Republic of China ("China"). *See Certain Frozen Warmwater Shrimp from the People's Republic of China*, 70 Fed. Reg. 5149 (Dep't of Commerce Feb. 1, 2005) (notice of amended final determination of sales at less than fair value and antidumping duty order). Hilltop, an exporter of subject merchandise from China, was a mandatory respondent in both the Fourth and Fifth Reviews.[2]   Appellee, the Ad Hoc Shrimp Trade Action Committee (the "Shrimp Trade Committee"), was a petitioner in the underlying antidumping duty investigation leading to the issuance of the antidumping duty order.

A. Fourth Administrative Review

On March 26, 2009, Commerce initiated the Fourth Administrative Review covering entries of subject merchandise made between February 1, 2008 and January 31, 2009. *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam and the People's Republic of China*, 74 Fed. Reg. 13,178 (Dep't of Commerce Mar. 26, 2009) (initiation of administrative review).   Hilltop was selected as one of two mandatory respondents in the review.   At the beginning of the review, Hilltop filed a separate rate certification, representing that neither the company nor its affiliates were controlled by the Chinese government, and requested separate rate status, which

---

Supp. 2d 1315, and sustained the calculation of the country-wide rate in the Fourth Review in *Ad Hoc Shrimp II*, 992 F. Supp. 2d 1285.   Because Commerce's determinations in both reviews are substantially the same, and because the parties raise identical arguments, this court addresses both appeals in this opinion.

[2]   The Fourth and Fifth Reviews involved nearly identical facts except that in the Fourth Review, Commerce determined Hilltop had made sales of subject merchandise allegedly sourced from Cambodia.

means it would receive a company-specific antidumping duty rate instead of the country-wide rate calculated for the China-wide entity.

As part of the review, Hilltop responded to a number of questionnaires[3] from Commerce. In its Section A response, Hilltop informed Commerce that its sales and administrative facility is located in Hong Kong and it is affiliated with several Chinese shrimp producers and processors, as well as various companies in other third countries. The company also listed all of the shareholders and directors for each disclosed third-country affiliate. In response to Commerce's request for a list of third parties in which Hilltop or its owners, either collectively or individually, owned five percent or more in stock, Hilltop stated that "[n]one of the Hilltop Group companies or their individual owners own 5 percent or more in stock in any third parties." J.A.-1647, at 98f.[4] In a supplemental questionnaire response, Hilltop also stated "[n]one of the princip[als] of the Chinese companies, Hilltop (HK) or the Taiwanese companies held any other business licenses

---

[3] During its administrative reviews, Commerce issues detailed nonmarket economy questionnaires to foreign respondents in the proceedings to gather information from which to calculate dumping margins. *See* 19 C.F.R. §§ 351.221, 351.301(c)(1) (2009). These questionnaires are divided into sections: Section A covers general corporate information, including corporate and business structure, affiliations with other companies, and ownership details; Section C covers U.S. sales data; and Section D covers production data. Commerce may issue supplemental questionnaires if additional information is required.

[4] The suffix -1514 denotes the record materials in Appeal No. 2014-1514, while the suffix -1647 denotes those in Appeal No. 2014-1647.

during the [period of review] other than the ones provided in [Hilltop's Section A questionnaire response]." J.A.-1647, at 151i. The separate rate certification and questionnaire responses were certified by Hilltop's general manager and part-owner To Kam Keung ("Mr. To"). J.A.-1647, at 80, 86–87.

On March 12, 2010, Commerce published the *Preliminary Results* for the Fourth Administrative Review. *Certain Frozen Warmwater Shrimp from the People's Republic of China*, 75 Fed. Reg. 11,855 (Dep't of Commerce Mar. 12, 2010) (preliminary results, preliminary partial rescission of antidumping duty administrative review, and intent not to revoke, in part). In the *Preliminary Results*, Commerce found Hilltop was eligible for separate rate status. *Id.* at 11,859. In addition, Commerce calculated a de minimis dumping margin based on Hilltop's reported sales and production data. *Id.* at 11,861. These determinations were left unchanged in Commerce's *Final Results* for the Fourth Review, published on August 13, 2010. *Certain Frozen Warmwater Shrimp from the People's Republic of China*, 75 Fed. Reg. 49,460, 49,463 (Dep't of Commerce Aug. 13, 2010) (final results and partial rescission of antidumping duty administrative review).

On September 10, 2010, the Shrimp Trade Committee appealed these *Final Results* to the CIT, challenging Commerce's selection of mandatory respondents and certain valuations. After a remand regarding the selection of mandatory respondents, the CIT affirmed Commerce's determinations. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 828 F. Supp. 2d 1345 (Ct. Int'l Trade 2012), *appeal docketed*, No. 2012-1416 (Fed. Cir. May 24, 2012). The CIT's decision was appealed to this court. While the appeal was pending before this court, however, the Government moved for a voluntary remand to reconsider the *Final Results* in light of certain information that surfaced in the recently-concluded Sixth

Administrative Review. This information indicated Hilltop might have provided false or incomplete information regarding its affiliates in the Fourth Review. On May 24, 2013, this court granted the Government's motion for voluntary remand and issued its mandate. On July 19, 2013, the CIT issued an order remanding the Fourth Review proceedings to Commerce pursuant to this court's mandate.

## B. Fifth Administrative Review

On April 9, 2010, Commerce initiated the Fifth Administrative Review, covering entries of subject merchandise made between February 1, 2009 and January 31, 2010. *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam and the People's Republic of China,* 75 Fed. Reg. 18,154 (Dep't of Commerce Apr. 9, 2010) (initiation of administrative review). Hilltop was selected as the sole mandatory respondent. The company requested and was granted permission to file information regarding its eligibility for separate rate status as part of its Section A questionnaire response, instead of through a separate rate certification. Thereafter, the company submitted its Section A response containing the same information as was reported in the Fourth Review. Specifically, Hilltop again reported its sales and administrative facility is located in Hong Kong and it is affiliated with several Chinese shrimp producers and processors, as well as various companies in other third countries. It also listed all of the shareholders and directors for each disclosed third-country affiliate. In response to Commerce's request for a list of third parties in which Hilltop or its owners, either collectively or individually, owned five percent or more in stock, Hilltop again stated that "[n]one of the [Hilltop] Group companies or their individual owners own 5 percent or more in stock in any third parties." J.A.-1514, at 94. These responses were certified by Mr. To.

On February 14, 2011, Commerce published the *Preliminary Results* for the Fifth Administrative Review. *Certain Frozen Warmwater Shrimp from the People's Republic of China*, 76 Fed. Reg. 8338 (Dep't of Commerce Feb. 14, 2011) (preliminary results and preliminary partial rescission of fifth antidumping duty administrative review). In the *Preliminary Results*, Commerce again found Hilltop eligible for a separate rate and calculated a de minimis dumping margin based on Hilltop's reported sales and production data. *Id.* at 8340–41, 8343. These determinations were left unchanged in Commerce's *Final Results* for the Fifth Review, published on August 19, 2011. *Certain Frozen Warmwater Shrimp from the People's Republic of China*, 76 Fed. Reg. 51,940 (Dep't of Commerce Aug. 19, 2011) (final results and partial rescission of antidumping duty administrative review).

On September 1, 2011, the Shrimp Trade Committee appealed the *Final Results* for the Fifth Review to the CIT, challenging Commerce's selection of mandatory respondents and certain valuations and calculations. The CIT remanded certain aspects of the *Final Results* to Commerce for further consideration. While remand was pending, Commerce moved for permission to reopen the administrative record to consider new evidence from the Sixth Review that suggested Hilltop had filed false or incomplete information. "Because Commerce's request to expand the scope of remand was based on a substantial and legitimate concern, the motion was granted." *Ad Hoc Shrimp I*, 925 F. Supp. 2d at 1317.

## C. Sixth Administrative Review

Hilltop was again selected as a mandatory respondent in the Sixth Review. In the *Preliminary Results* of that review, issued on March 2, 2012, Hilltop received separate rate status and a de minimis duty rate. *See Certain Frozen Warmwater Shrimp from the People's Republic of China*, 77 Fed. Reg. 12,801 (Dep't of Commerce Mar. 2,

2012) (preliminary results, partial rescission, extension of time limits for the final results, and intent to revoke, in part, of the sixth antidumping duty administrative review).

On March 12, 2012, however, the Shrimp Trade Committee placed on the record public information it obtained following the convictions of several individuals associated with Hilltop and its United States affiliate, Ocean Duke Corp. ("Ocean Duke"). These materials indicate that in March 2011, Mr. Duke Chau-Shing Lin ("Mr. Lin"), the president of Ocean Duke, and the Government entered into a written plea agreement wherein Mr. Lin pled guilty to two misdemeanor counts with respect to the misbranding of certain fish imports. The information includes the sentencing report prepared by the Government, which contains information about its five-year investigation into a scheme to transship shrimp illegally into the United States through Cambodia beginning shortly after the publication of the original antidumping duty order. The information also references Hilltop's Cambodian affiliate, Ocean King (Cambodia) ("Ocean King"), and includes emails from 2004 between Mr. Lin and Mr. To discussing the establishment of a Cambodian shrimp processing factory and the shipment of shrimp from Vietnam to Cambodia for repackaging and relabeling.

The documents also include import data from U.S. Customs and Border Protection demonstrating that, between May 2004 and July 2005, Ocean Duke (Hilltop's U.S. affiliate) imported over fifteen million pounds of shrimp declared as product of Cambodia, followed by an additional 143 entries attributable to Ocean King in the second half of 2005. Official production data from the Cambodian government, by contrast, indicates Cambodia produced less than 400,000 pounds of shrimp during all of 2004 and 2005.

In response to this information, Hilltop again insisted it was "not affiliated with any company producing shrimp in Cambodia. In other words, Hilltop is not affiliated with Ocean King. . . . Hilltop confirms that neither the company, nor its owners or officers, invested any funds in Ocean King." J.A.-1647, at 3424; J.A.-1514, at 3343. Mr. To again certified these statements as "accurate and complete." J.A.-1647, at 3426; J.A.-1514, at 3345. Commerce then issued another supplemental questionnaire to Hilltop asking, among other things, whether the company had a Cambodian affiliate called Ocean King. The questionnaire specifically warned Hilltop that non-cooperation could result in a rate calculated using "adverse facts available" ("AFA"). *See* 19 U.S.C. § 1677e(a)(2)(A)–(D) (2006). In its questionnaire response, Hilltop stated there was no valid basis for making inquiries regarding prior administrative reviews in the context of the present (sixth) review. Relying on that argument, it only provided information from the Fourth, Fifth, and Sixth Reviews,[5] but declined to answer questions from earlier reviews, stating it would not be relevant to the Sixth Review. The company also responded it was improper to investigate transshipment allegations in an antidumping administrative review proceeding. Hilltop also restated it "had no Cambodian affiliate or Cambodian affiliates," and "had no affiliation or business dealings with Ocean King (Cambodia)." J.A.-1647, at 3621, 3623; J.A.-1514, at 3809.

---

[5] Because in the Sixth Review Hilltop sought a "three-zero revocation" from the Order, which allows the revocation of an antidumping order if, among other things, all covered exporters and producers "have sold the subject merchandise at not less than normal value for a period of at least three consecutive years," 19 C.F.R. § 351.222(b)(1)(i)(A) (2009), Hilltop acknowledged the information from the Fourth and Fifth Reviews was relevant to the Sixth Review.

Commerce then placed Ocean King's Cambodian public registration documents on the record. These documents show Ocean King was established in 2005 by Mr. To, Hilltop's general manager and part-owner, and two Cambodian individuals, and that Mr. To served as one of Ocean King's board members and was a 35% shareholder. Commerce then issued Hilltop another supplemental questionnaire asking the company to reconcile its prior responses that it had no affiliation with any Cambodian companies with these registration documents, and again warned that non-cooperation could result in application of AFA.

In its response, Hilltop admitted it was affiliated with Ocean King until September 28, 2010 (about halfway through the Sixth Review) and that it had made "sales of Cambodian origin shrimp" during the Fourth Review. J.A.-1647, at 3703; J.A.-1514, at 3622. The company, however, continued to refuse to comment on the alleged transshipment activities. In a subsequent filing, Hilltop explained Mr. To's "prior statements on affiliation may have been in error (e.g., due to his lack of operational involvement with Ocean King or for whatever reason)." J.A.-1647, at 2181; J.A.-1514, at 2112.

On September 4, 2012, Commerce published its *Final Results* for the Sixth Review. *Certain Frozen Warmwater Shrimp from the People's Republic of China*, 77 Fed. Reg. 53,856 (Dep't of Commerce Sept. 4, 2012) (final results of administrative review). Commerce determined Hilltop impeded the Sixth Review by repeatedly failing to disclose its five-year affiliation with Ocean King and by denying the affiliation until Commerce placed irrefutable evidence on the record. *Id.* at 53,859. Further, Commerce found Hilltop's misrepresentations rendered the entirety of its submissions unusable and therefore the company failed to rebut the presumption that it was part of the China-wide entity, as required for separate rate status. Accordingly,

instead of a separate rate, Hilltop was assigned the China-wide rate of 112.81%, which was based on AFA.

## D. Further Proceedings in the Fourth and Fifth Administrative Reviews

On August 5, 2013, Commerce added the information from the Sixth Review to the Fourth Review's record. On the basis of this information, Commerce determined in its *Remand Results* that Hilltop "provided false and incomplete information regarding its affiliates in the fourth administrative review" due to its omission of Ocean King from its list of third-country affiliates. Final Results of Redetermination Pursuant to Court Remand (Fourth Review), at 2 (Dep't of Commerce Nov. 4, 2013) (J.A.-1647, at 4034) ("*AR4 Remand Results*"). Commerce also determined the omission of Ocean King from Hilltop's list of affiliates rendered all other information submitted by Hilltop unreliable, and consequently Hilltop had not rebutted the presumption that it was part of the China-wide entity. *Id.* Hilltop was therefore assigned the China-wide rate of 112.81%. *Id.*

Similarly, on February 14, 2013,[6] Commerce placed the information from the Sixth Review on the record for the Fifth Review. On the basis of this information, Commerce concluded, as it did in the Fourth Review, that Hilltop "provided false and incomplete information re-

---

[6] As is evident, the Fifth Review preceded the Fourth Review by several months and arrived at the CIT first. The remand on corroboration issues in the Fifth Review and the voluntary remand in the Fourth Review then proceeded roughly simultaneously, and the corroboration analyses in the Fourth Review *Remand Results* and Fifth Review *Second Remand Results* are identical. For this reason, they were jointly addressed in the CIT's opinion in *Ad Hoc Shrimp II*.

garding its affiliates" due to its omission of Ocean King from its list of third-country affiliates. Final Results of Redetermination Pursuant to Court Remand (Fifth Review) (First Remand), at 2 (Dep't of Commerce Apr. 1, 2013) (J.A.-1514, at 3803) ("*AR5 1st Remand Results*"). Therefore, as in the Fourth Review, Commerce determined the omission of Ocean King from Hilltop's list of affiliates rendered all other information submitted by Hilltop unreliable, and the company failed to rebut the presumption that it was part of the China-wide entity. *Id.* Accordingly, Hilltop was assigned the China-wide rate of 112.81%. *Id.*

In *Ad Hoc Shrimp I*, Hilltop challenged Commerce's *First Remand Results* for the Fifth Review as not supported by substantial evidence. *Ad Hoc Shrimp I*, 925 F. Supp. 2d at 1317. On July 23, 2013, the CIT sustained Commerce's determination to deny Hilltop separate rate status, but remanded for review of Commerce's selection of the antidumping duty rate for the China-wide entity (including Hilltop) because it found Commerce had failed to corroborate the rate as required by statute. *Id.* at 1327 ("On remand, Commerce must either adequately corroborate the 112.81 percent [China]-wide rate and explain how its corroboration satisfies the requirements of [the statute], or calculate or choose a different countrywide rate that better reflects commercial reality, as supported by substantial evidence.").

On a second remand, Commerce placed on the record information from the underlying antidumping duty investigation and a Section 129 Proceeding[7] that followed

---

[7] "Section 129" refers to proceedings undertaken in response to a decision by the World Trade Organization's ("WTO") Dispute Settlement Body that a United States trade agency's determination is inconsistent with the United States's obligations as a member of the WTO's

China's appeal of the original antidumping investigation to the WTO's Dispute Settlement Body.[8]  The information included CONNUM[9]-specific margin data for a mandatory respondent in the original investigation, Shantou Red Garden Foodstuff Co., Ltd. ("Red Garden"), as recalculated after the Section 129 Proceeding.  Hilltop submitted comments on this new data and requested additional

---

Antidumping and/or Subsidies and Countervailing Measures Agreements.  *See* 19 U.S.C. § 3538(b).  The Section 129 determination at issue here is *Certain Frozen Warmwater Shrimp from the People's Republic of China and Diamond Sawblades and Parts Thereof from the People's Republic of China*, 78 Fed. Reg. 18,958 (Dep't of Commerce Mar. 28, 2013) (notice of implementation of determinations under Section 129 of the Uruguay Round Agreements Act and partial revocation of the antidumping duty orders) ("Section 129 Determination").

[8]    As discussed below, this information was also used to corroborate the selection of the 112.81% rate in the Fourth Review.

[9]    As described in *Ad Hoc Shrimp II*, 992 F. Supp. 2d at 1296, in its antidumping proceedings, Commerce uses different control numbers ("CONNUMs") "to identify the individual models of products for matching purposes." *See, e.g.*, Final Results of Redetermination Pursuant to Court Remand (Fifth Review) (Second Remand), at 5 n.18 (Dep't of Commerce Nov. 7, 2013) (J.A.-1514, at 4262–86) ("*AR5 2nd Remand Results*").  "Identical products are assigned the same CONNUM in both the comparison market sales database (or in a nonmarket economy context, the factors of production database) and U.S. sales database." *Id.* (citing Antidumping Manual, ch. 4, at 10 (Oct. 13, 2009)).  "CONNUM-specific margins result in calculated margins that represent the pricing behavior related to groups of sales," grouped by model type.  *Id.* at 13.

information be placed on the record. In response, Commerce placed on the record additional information for Red Garden from the Section 129 Proceeding. On November 4, 2013, Commerce issued its *Second Remand Results*, continuing to use the 112.81% rate as the China-wide rate as corroborated by the additional record evidence. *See generally AR5 2nd Remand Results*.

In *Ad Hoc Shrimp II*, the CIT addressed Commerce's separate rate determination for the Fourth Review as well as its corroboration of the China-wide rate of 112.81% in both the Fourth and Fifth Reviews. The CIT affirmed (1) Commerce's separate rate status determination in the Fourth Review for the reasons stated in affirming the Fifth Review's *First Remand Results* in *Ad Hoc Shrimp I*, and (2) the selection of the China-wide rate based on AFA assigned to Hilltop for both the Fourth and Fifth Reviews.

Hilltop appeals the CIT's affirmance of Commerce's denial of separate rate status in the Fourth and Fifth Reviews as well as the CIT's holding with respect to corroboration of the China-wide rate Hilltop received. This court has jurisdiction under 28 U.S.C. § 1295(a)(5) (2012).

## DISCUSSION

### I. Standard of Review

This court reviews decisions of the CIT de novo, "apply[ing] anew the same standard used by the [CIT]." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008). Under that standard, this court must uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Although such review amounts to repeating the work of the [CIT], we have noted that 'this court will not ignore the informed opinion of the [CIT].'" *Diamond Sawblades Mfrs. Coal. v. United*

*States*, 612 F.3d 1348, 1356 (Fed. Cir. 2010) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994)); *see also Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) ("When performing a substantial evidence review, . . . we give great weight to the informed opinion of the [CIT]. Indeed, it is nearly always the starting point of our analysis." (internal quotation marks and citation omitted)).

Substantial evidence is defined as "more than a mere scintilla," as well as evidence that a "reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 217 (1938). This court's review is limited to the record before Commerce in the particular proceeding at issue and includes all evidence that supports and detracts from Commerce's conclusion. *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009). An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## II. Section 502 of the Trade Preferences Extension Act of 2015 Does Not Apply to the Instant Appeals

After the court heard oral argument, President Obama signed the Trade Preferences Extension Act of 2015 ("the Act") on June 29, 2015. Pub. L. No. 114-27, 129 Stat. 362 (2015). Section 502 of the Act amends 19 U.S.C. § 1677e, the statute at the center of these appeals. *Id.* § 502, 129 Stat. at 383–84. In plain terms, it alters some of the standards that Commerce applies in selecting and corroborating AFA rates for uncooperative respondents. *Id.*

On July 10, 2015, counsel for the Shrimp Trade Committee filed a notice of supplemental authority, advising the court that section 502 of the Act "relates to the statutory corroboration requirements" associated with the appeals. Appellee's Notice of Suppl. Authority at 2

(citation omitted). On August 10, 2015, Hilltop filed its own notice of supplemental authority, informing the court that Commerce recently issued an interpretive rule that "clearly demonstrates that [section 502 of] the Act does not apply to" the instant appeals. Appellants' Notice of Suppl. Authority at 1 (citing *Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 Fed. Reg. 46,793 (Dep't of Commerce Aug. 6, 2015) ("*Commerce Notice*")).

Because section 502 of the Act does not address explicitly its temporal reach, the court subsequently sought supplemental briefing from the parties. The court observed that, "applying normal rules of statutory construction, it appears that Congress intended amended 19 U.S.C. § 1677e to have prospective effect." Order Requesting Suppl. Briefing at 3 (Fed. Cir. Aug. 11, 2015). As a result, the court asked the parties to focus on two questions: "(1) Whether the normal rules of statutory construction warrant finding that amended 19 U.S.C. § 1677e has prospective effect?" and "(2) If the normal rules of statutory construction do not necessitate a particular result, whether Commerce's recent interpretive rule deserves deference and, if so, what degree of deference should be afforded?" *Id.* at 5.

The Shrimp Trade Committee, Hilltop, and the Government each filed a response on August 27, 2015. *See generally* Appellee's Suppl. Br.; Appellants' Suppl. Br.; Government's Suppl. Br. Hilltop and the Government generally contend that normal rules of statutory construction support finding that section 502 of the Act has only prospective effect, such that it does not apply to the instant appeals. *See* Appellants' Suppl. Br. 2–6;[10] Gov-

---

[10] The analysis in Hilltop's supplemental brief mirrors the analysis that the court provided in its order

ernment's Suppl. Br. 1–8.[11] The Shrimp Trade Committee takes a different view, arguing that application of section 502 of the Act "to Hilltop's appeals is prospective in nature with no impermissible retroactive effect" because section 502 of the Act is "ambiguous" with respect to its temporal reach and liquidation, the relevant triggering event, has not yet occurred. Appellee's Suppl. Br. 3, 10. For the reasons provided, the court finds that section 502 of the Act does not apply to the Commerce determinations under review.

"'[A] statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication.'" *Fernandez–Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (quoting *United States v. St. Louis, S.F. & Tex. Ry. Co.*, 270 U.S. 1, 3 (1926)). The court must first assess "'whether Congress has expressly prescribed the statute's proper reach,' . . . and in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying 'our normal rules of construction.'" *Id.* (first quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994); then quoting *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)). "If that effort fails, we ask whether applying the statute . . . would have a retroactive consequence in the disfavored sense of 'affecting

---

requesting supplemental briefing and, thus, does not warrant further discussion. *Compare* Appellants' Suppl. Br., *with* Order Requesting Suppl. Briefing. The court addresses the Government's arguments below.

[11] Amicus Curiae Nucor Corporation also submitted a brief on the matter, but the court does not address its contents separately because they substantially overlap with the points raised by the Government and the Shrimp Trade Committee. *Compare* Nucor's Suppl. Br., *with* Government's Suppl. Br. *and* Appellee's Suppl. Br.

substantive rights, liabilities, or duties on the basis of conduct arising before its enactment.'" *Id.* (brackets omitted) (quoting *Landgraf*, 511 U.S. at 278). "If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Landgraf*, 511 U.S. at 280.

As previously noted, section 502 of the Act does not state explicitly that it is retroactive or that it applies to final administrative determinations that remain subject to judicial review. The legislative history surrounding section 502 of the Act similarly fails to answer the precise question. *See* S. Rep. No. 114-45, at 37 (2015) (discussing section 501, ultimately enacted as section 502). However, applying normal rules of statutory construction, it is evident that Congress intended section 502 of the Act to apply only to Commerce determinations made on or after the date of enactment. Unlike with section 502 of the Act, Congress explicitly stated that other provisions in the Act have retroactive effect. *See, e.g.*, Pub. L. No. 114-27, § 201(b)(2), 129 Stat. at 371 (providing for retroactive application of the generalized system of preferences to certain entries entered prior to the date of enactment); *id.* §§ 405, 407(g), 129 Stat. at 377–79, 383 (stating that the reauthorized trade adjustment assistance laws apply to certification petitions filed prior to the date of enactment). Congress also explicitly provided for the delayed implementation of other provisions in the Act. *See, e.g., id.* § 601(c), 129 Stat. at 412–13 (explaining that certain amendments to Chapter 62 of the Harmonized Tariff Schedule of the United States "take effect on the 180th day after the date of enactment of this Act"); *id.* § 602(d), 129 Stat. at 414 (explaining that certain amendments to Chapter 64 of the Harmonized Tariff Schedule of the United States "take effect on the 15th day after the date of enactment of this Act").

The juxtaposition of section 502 of the Act with the legislation's other provisions implies that, had Congress wanted section 502 of the Act to have retroactive effect or to apply to pending appeals, it would have said so. *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("A familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute."), *superseded by statute on other grounds*, Military Commissions Act of 2006, Pub. L. No. 109-366, § 7(b), 120 Stat. 2600, 2636 (2006); *Lindh*, 521 U.S. at 327–30 (holding that, if legislation includes a provision that expressly applies to cases pending on the date of enactment and another provision that does not, the construction "indicat[es] implicitly" that the latter applies only to cases filed after the date of enactment); *Gozlon–Peretz v. United States*, 498 U.S. 395, 404 (1991) ("Congress' silence [as to the effective date for the Anti-Drug Abuse Act ('ADAA') as a whole] contrasts with the express effective date provisions for other discrete sections of the ADAA."); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)); *cf.* Application of Countervailing Duty Provisions to Nonmarket Economy Countries, Pub. L. No. 112-99, §§ 1(b), 2(b), 126 Stat. 265, 265–67 (2012) (explicitly providing retroactive and prospective effective dates for various provisions within same enactment). This inference finds further support in Congress's simultaneous enactment of the provisions with different effective dates. *See, e.g.*, *Field v. Mans*, 516 U.S. 59, 75 (1995) ("The more apparently deliberate the contrast, the stronger the inference, as applied, for example, to contrasting statutory sections originally enacted simultaneously in relevant respects.").

The legislative history also supports the inference, given that six weeks before the Act's passage Congress was cognizant that it would have to decide when trade remedy amendments under consideration would take effect. *See, e.g.*, S. Rep. No. 114-45, at 45 (explaining that a particular trade remedy amendment, which Congress ultimately did not enact, would apply to countervailing duty investigations and reviews initiated "(1) before the date of the enactment of this bill, if the investigation or review is pending a final determination as of such date of enactment; and (2) on or after such date of enactment"). By omitting an effective date for section 502 of the Act, while explicitly providing for different effective dates for other provisions, Congress unambiguously intended section 502 of the Act to apply prospectively only—i.e., to apply only to Commerce determinations made on or after the date of enactment. Thus, it does not govern the Commerce determinations under review.[12]

The parties' contrary arguments are unpersuasive. The Shrimp Trade Committee contends that the court must find that the Act does not unambiguously identify the effective date of section 502 of the Act because the other provisions with retroactive effect "address circumstances where the relevant law had expired at the time the conduct occurred." Appellee's Suppl. Br. 2. The

---

[12] Because the court finds that section 502 of the Act applies only to Commerce determinations made after the date of enactment, and Commerce undoubtedly made the determinations under review before that date, left for another day is the question of whether Commerce's application of section 502 of the Act after the effective date nevertheless has an impermissible retroactive effect based upon events occurring prior to the effective date. Commerce has found that it would not. *See Commerce Notice*, 80 Fed. Reg. at 46,794.

Government similarly "hesitate[s] to place too much emphasis on this juxtaposition because the other provisions are not part of the . . . trade remedies title to which section 502 belongs and substantively concern the extension of lapsed programs, which naturally requires Congress to deal with the status of an interim period." Government's Suppl. Br. 5 (citation omitted). These arguments support, rather than undermine, the court's conclusion. That Congress knew it would have to address gaps in time as a result of its reauthorization of certain laws means that it was sensitive to the date that the Act's provisions would take effect, including section 502 of the Act. Congress's decision to delay implementation of other aspects of the Act confirms as much, *see, e.g.*, Pub. L. No. 114-27, § 601(c), 129 Stat. at 413; *id.* § 602(d), 129 Stat. at 412–13, as does the legislative history, *see* S. Rep. No. 114-45, at 45.

The Government contends that the subject of section 502 of the Act—"the decision-making standards Commerce applies in selecting and corroborating [AFA] rates"—necessarily identifies the effective date because "by its nature it applies only to open Commerce proceedings." Government's Suppl. Br. 1. This tautology simply confirms the provision's subject matter and fails to address the question regarding the temporal reach of section 502 of the Act. It is undisputed that section 502 of the Act discusses "the decision-making standards Commerce applies" in its determination.[13] As Commerce correctly

---

[13]   The Government explains that the dates of Commerce's determinations, not the dates of entry, are the relevant triggering events for purposes of a retroactive analysis. Government's Suppl. Br. 1–2, 4. The Shrimp Trade Committee makes similar arguments. Appellee's Suppl. Br. 7–9. A particular passage from the court's order appears to have inspired the parties' arguments.

recognized, "[t]he Act does not contain dates of application for any of these amendments," *Commerce Notice*, 80 Fed. Reg. at 46,793, so the relevant question left to answer is the temporal reach of section 502 of the Act.

The Government's view that a provision's subject matter "by its nature" dictates its effective date does not appreciate how Congress legislates. In recently-enacted legislation, Congress ably distinguished "decision-making standards" from the date that those standards would take effect. *See* Pub. L. No. 112-99, §§ 1(a) (discussing decision-making standards), 1(b) (discussing effective date, including its application to pending appeals), 2(a) (discussing decision-making standards), 2(b) (discussing effective date), 126 Stat. at 265–67. Indeed, Supreme Court precedent teaches that, while it may be appropriate to discern whether a statute has an impermissible retroactive impact vis-à-vis the conduct that it regulates (i.e., Commerce's decision-making standards), such an analysis comes only after a court determines that neither a statute's express terms nor the normal rules of statutory construction address the question of its temporal reach. *See Fernandez–Vargas*, 548 U.S. at 37. *But see* Government's Suppl. Br. 3 (citing *Republic of Austria v. Altmann*, 541 U.S. 677, 698 n.17 (2004)). Taken to its logical conclusion, the Government's view would be that, absent an

---

*See* Order Requesting Suppl. Briefing at 3 (stating that the court "must decide whether the amended statute applies to the past conduct (and, thus, past entries) at issue in this appeal"). By using the term "entries," the court did not intend to suggest that entry dates, rather than the dates of Commerce's determinations, served as the relevant points of inquiry. Instead, we meant only to convey the notion that Commerce's determinations do not exist in a vacuum and necessarily affect entries that enter in a given period of time.

express retroactivity provision, any change to decision-making standards necessarily means that legislation has prospective effect only. Supreme Court precedent and an examination of Congress's past acts prevent us from adopting that view. *See, e.g.*, *Fernandez–Vargas*, 548 U.S. at 40; Pub. L. No. 112-99, §§ 1(a)–(b), 126 Stat. at 265–67.

Finally, because the court determines that section 502 of the Act unambiguously applies only to Commerce determinations made after the date of enactment, it need not address the second question that it posed to the parties. *See* Order Requesting Suppl. Briefing at 5 (asking "If the normal rules of statutory construction do not necessitate a particular result, whether Commerce's recent interpretive rule deserves deference and, if so, what degree of deference should be afforded?"). The court now turns to the remaining issues on appeal.

III. Legal Framework

A. Separate Rate Status

The antidumping statute authorizes Commerce to impose duties on imported goods that are sold in the United States at less-than-fair value and that injure a domestic industry. *See* 19 U.S.C. § 1673. Once an antidumping duty order covering certain goods is in place, "Commerce periodically reviews and reassesses antidumping duties" during administrative reviews. *Gallant Ocean (Thai.) Co. v. United States*, 602 F.3d 1319, 1321 (Fed. Cir. 2010) (citing 19 U.S.C. § 1675(a)).

In calculating antidumping margins, Commerce generally determines individual dumping margins for each known exporter or producer. 19 U.S.C. § 1677f-1(c)(1). If it is not practicable to calculate individual dumping margins for every exporter or producer, Commerce may examine a reasonable number of respondents (mandatory respondents), such as Hilltop. *See id.* § 1677f-1(c)(2). In antidumping duty proceedings involving merchandise

from a nonmarket economy country,[14] however, Commerce presumes all respondents are government-controlled and therefore subject to a single country-wide rate. *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997). Respondents may rebut this presumption and become eligible for a separate rate by establishing the absence of both de jure and de facto government control. *Id.* If a respondent fails to establish its independence, Commerce relies upon the presumption of government control and applies the country-wide rate to that respondent. *Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (Fed. Cir. 2002) ("Under the [nonmarket economy] presumption, a company that fails to demonstrate independence from the [nonmarket economy] entity is subject to the countrywide rate, while a company that demonstrates its independence is entitled to an individual rate as in a market economy.").

### B. Adverse Facts Available

During its periodic administrative reviews, Commerce requests information from respondents and if a respondent "withholds information that has been requested by [Commerce]," "fails to provide such information by the

---

[14] A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because it deems China to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1350 n.1 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

deadlines . . . or in the form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified," Commerce is permitted to use "facts otherwise available" in making its determinations. 19 U.S.C. § 1677e(a)(2)(A)–(D). If Commerce further finds a respondent has "failed to cooperate by not acting to the best of its ability to comply with a request for information," then it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" (i.e., it may apply AFA). *Id.* § 1677e(b). "[T]he statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

In selecting an AFA rate, Commerce may use information from the petition, investigation, prior administrative reviews, or "any other information placed on the record." 19 U.S.C. § 1677e(b); *see Gallant Ocean*, 602 F.3d at 1323 ("[I]n the case of uncooperative respondents," Commerce has discretion to "select from a list of secondary sources as a basis for its adverse inferences."); *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). However, when Commerce "relies on secondary information rather than on information obtained in the course of an investigation or review," it "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c). To corroborate secondary information, Commerce must find the information has "probative value," *KYD, Inc. v. United States*, 607 F.3d 760, 765 (Fed. Cir. 2010), by demonstrating the rate is both reliable and relevant, *Gallant Ocean*, 602 F.3d at 1323–25.

## IV. Commerce's Decision to Deny Appellant Separate Rate Status Was Supported by Substantial Evidence and Was in Accordance with Law

### A. Commerce's AFA Determination

Hilltop argues Commerce's determination that Hilltop was ineligible for a separate rate is unsupported by substantial evidence and contrary to law. It notes the decision "to reject all of Hilltop's reported data and to treat Hilltop as part of the [China]-wide entity as total [AFA] . . . [was] predicated upon a single finding": that Hilltop failed to report its affiliation with Ocean King on its questionnaire responses. Appellants' Br.-1647, at 18; Appellants' Br.-1514, at 20. According to Hilltop, because "the information regarding the Ocean King affiliation was not pertinent to Commerce's margin calculation in [the Fourth and Fifth Reviews], there was no legitimate basis to apply facts available or an adverse inference for its omission." Appellants' Br.-1647, at 19; Appellants' Br.-1514, at 21 (capitalization omitted). In support, Hilltop contends "the application of facts otherwise available and an adverse inference requires that there be a 'gap' of necessary information missing from the record," and "[i]f the unreported information is not necessary, then there is no valid basis for application of any adverse inference." Appellants' Br.-1647, at 24; Appellants' Br.-1514, at 26. That is, Hilltop contends because information regarding third-country affiliates is "not pertinent to the calculation of Hilltop's margin," Commerce has failed to show there is a gap in the record. Appellants' Br.-1647, at 23; Appellants' Br.-1514, at 25.

Hilltop says that its omission is not relevant because "information regarding a third country affiliate that is not involved in the production, sale or distribution of subject merchandise is *of no consequence* in the calculation of a dumping margin." Appellants' Br.-1647, at 27; Appellants' Br.-1514, at 29 (emphasis added). In support,

Hilltop cites a prior administrative review and asserts, "Commerce has previously determined that the failure to disclose an affiliate does not require an adverse inference unless the affiliate was involved in the production or sale of the subject merchandise during the period under review." Appellants' Br.-1647, at 24; Appellants' Br.-1514, at 26 (citing *Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 70 Fed. Reg. 1870 (Dep't of Commerce Jan. 11, 2005) (final results of administrative review)). Hilltop also cites the CIT's decision in *Ta Chen Stainless Steel Pipe Co. v. United States*, 31 Ct. Int'l Trade 794, 821–22 (2007) (unpublished), where it stated "[i]f, as the plaintiff and the defendant assert, the entities allegedly affiliated with Ta Chen within the meaning of 19 U.S.C. § 1677(33)(A)–(E) were in fact uninvolved with the subject merchandise, a finding on remand of affiliation would not have any impact thereon."

Here, Hilltop argues, had the company disclosed its affiliation with Ocean King, this information would have "*no impact on Commerce's margin calculation*." Appellants' Br.-1647, at 29; Appellants' Br.-1514, at 30. This is because, Hilltop contends, "there were no shipments at all of shrimp from Cambodia during the [Fourth and Fifth Reviews]"; "Hilltop (through its US affiliate, Ocean Duke) made only a de minimis quantity of sales of shrimp originating from Cambodia in [the Fourth Review]"; and "had no sales of Cambodian shrimp in [the Fifth Review]." Appellants' Br.-1647, at 27; Appellants' Br.-1514, at 30.

Hilltop also argues "[e]ven if the record herein did contain substantial evidence to support allegations of transshipment or circumvention, it would be improper to address such allegations in the context of the [Fourth and Fifth Review] proceeding[s]." Appellants' Br.-1647, at 42; Appellants' Br.-1514, at 43. This is because, according to Hilltop, investigations into the circumvention of antidumping duty orders are "entirely separate proceeding[s]" with "separate procedures" than administrative reviews.

Appellants' Br.-1647, at 42; Appellants' Br.-1514, at 43–44.

Finally, Hilltop argues there is no support for Commerce's use of total, as opposed to partial, AFA. Hilltop claims Commerce "cannot support its use of total AFA against Hilltop by claiming that the omission of Ocean King from the list of third country affiliates justifies the rejection of all of Hilltop's reported data." Appellants' Br.-1647, at 33; Appellants' Br.-1514, at 35. Hilltop says this court and the CIT "have repeatedly stated that a resort to total AFA is only permissible if the missing or unusable information is 'core' rather than 'tangential' to Commerce's dumping determination or where the deficiencies are so pervasive that they permeate all aspects of the reported data." Appellants' Br.-1647, at 33; Appellants' Br.-1514, at 35. In support, Hilltop cites, inter alia, *Jiangsu Changbao Steel Tube Co. v. United States*, 884 F. Supp. 2d 1295, 1305–06 (Ct. Int'l Trade 2012), where the CIT sustained the application of total AFA because the discovery of false statements and altered production and accounting records impeached the reliability of all reported data.

Substantial evidence supports Commerce's determination that Hilltop's withholding of information and its repeated misrepresentations rendered the company's submissions unreliable, and therefore the company was unable to rebut the presumption that it is part of the China-wide entity. Under 19 U.S.C. § 1677e(a)(2), if a respondent "withholds information that has been requested by [Commerce]" or "significantly impedes a proceeding," Commerce is permitted to use "facts otherwise available" in making its determinations. Here, Hilltop repeatedly withheld and misrepresented information regarding its affiliation with Ocean King. Indeed, while the public registration documents for Ocean King identified Mr. To as "a board member and 35 percent shareholder beginning in July 2005 and ending in September

2010," *AR4 Remand Results* at 8; *AR5 1st Remand Results* at 8, Hilltop misrepresented to Commerce that "[n]one of the [Hilltop] Group companies or their individual owners own 5 percent or more in stock in any third parties," *AR4 Remand Results* at 11; *AR5 1st Remand Results* at 12, and none of Hilltop's managers "held positions with any other firm, government entity, or industry organization during the [period of review]," *AR4 Remand Results* at 12 n.63; *AR5 1st Remand Results* at 13 n.65. In addition, the record shows Hilltop subsequently denied and concealed its affiliation with Ocean King until confronted with the public registration documents unequivocally revealing the affiliation. As the CIT found,

> Hilltop provided no explanation of its failure to disclose and subsequent repeated denial of its affiliation with Ocean King beyond a vague statement that the error may have been due to Mr. To's lack of personal involvement with Ocean King (despite unequivocal record evidence of his personal involvement and substantial investment during Ocean King's incorporation), "or *for whatever reason*."

*Ad Hoc Shrimp II*, 992 F. Supp. 2d at 1291 (emphasis added) (footnote omitted). Substantial evidence supports Commerce's conclusion that "Hilltop's failure to disclose its relationship with Ocean King . . . surely demonstrates that it impeded the proceeding by not disclosing the affiliation." *AR4 Remand Results* at 19; *AR5 1st Remand Results* at 19.

In addition to "significantly imped[ing] a proceeding," 19 U.S.C. § 1677e(a)(2), if Commerce further finds a respondent has "failed to cooperate by not acting to the best of its ability to comply with a request for information," then it may apply AFA. *Id.* § 1677e(b). Here, Commerce properly applied an adverse inference because, through material misrepresentations and refusal to

respond to its inquiries, Hilltop "failed to cooperate by not acting to the best of its ability." *See Nippon Steel*, 337 F.3d at 1383 ("[I]ntentional conduct, such as *deliberate concealment . . .* , surely evinces a failure to cooperate.").

Hilltop erroneously argues there was no gap in the information necessary to calculate its dumping margin. Commerce concluded that because Hilltop "provided false and incomplete information regarding its affiliates," it could not "determine whether any other misrepresentations exist on the record with regard to Hilltop's full universe of affiliates, corporate structure and sales process, or whether other information may be missing from the record," and therefore it was "unable to rely upon any of Hilltop's submissions in this segment." *AR4 Remand Results* at 2; *AR5 1st Remand Results* at 2. As is evident, the necessary information missing from the record was information supporting Hilltop's claim that it was eligible for a separate rate, including an accurate representation of Hilltop's corporate structure and indications of government control exercised through the company's Chinese affiliates. *See Ad Hoc Shrimp II*, 992 F. Supp. 2d at 1293.

Equally unavailing is Hilltop's argument that its affiliation with Ocean King was immaterial because Ocean King was not involved in the production of subject merchandise, so disclosure would have had no effect on the calculation of its duty rate. First, the CIT's decision in *Ta Chen* does not stand for the proposition, as Hilltop suggests, that third-country affiliate information "is of no consequence" if the affiliate is not involved in the production, sale, or distribution of subject merchandise. Indeed, while the CIT recognized such information might not have an effect, it also stated "[Commerce] has discretion on remand to request and evaluate new data. And it is *not absolutely certain* that affirmative affiliation determinations on remand would have no effect upon the plaintiff's antidumping-duty rate." *Ta Chen*, 31 Ct. Int'l Trade at 822 (emphasis added) (citations omitted). Second, at

issue here is whether the nondisclosure affected Hilltop's request for separate rate status, which it surely did. Indeed, Commerce's decision to reject Hilltop's submissions was based on its nondisclosure of its affiliate which called into question Hilltop's credibility. When offered the opportunity to explain itself, moreover, Hilltop continued to deny its affiliation until faced with irrefutable evidence. That Ocean King may not have been involved in the production of subject merchandise is irrelevant.

Hilltop's arguments regarding the transshipment evidence are also irrelevant. As the CIT noted, "Commerce's decision to invalidate Hilltop's separate rate representations as unreliable was not based on a definitive finding of transshipment, but rather on the impeachment of Hilltop's credibility as a consequence of evidence reasonably indicating that Hilltop deliberately withheld and misrepresented information," and these misrepresentations "may reasonably be inferred to pervade the data in the record beyond that which Commerce has positively confirmed as misrepresented." *Ad Hoc Shrimp II*, 992 F. Supp. 2d at 1293 (footnote omitted). Indeed, Commerce properly determined both that Hilltop's misrepresentations rendered the entirety of its submissions unreliable and that Hilltop's failure to respond to the transshipment evidence prevented Commerce from evaluating the impact of Hilltop's misrepresentations.

Commerce also properly applied total AFA, as opposed to partial AFA, because Hilltop's failure to disclose its affiliates and its misrepresentations undermined all of Hilltop's submissions regarding its ownership and corporate structure, as well as Commerce's ability to rely on Mr. To's certifications of those submissions. *See Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014) ("In general, use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty."). As the CIT

explained, information about Hilltop's corporate structure "is core, not tangential, to Commerce's analysis because it goes to the heart of Hilltop's corporate ownership and control." *Ad Hoc Shrimp I*, 925 F. Supp. 2d at 1324 (footnote omitted); *see also Ad Hoc Shrimp II*, 992 F. Supp. 2d at 1294–95. Here, "none of [Hilltop's] reported data is reliable or usable" because the "submitted data exhibited pervasive and persistent deficiencies that cut across all aspects of the data." *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011).

## B. Hilltop's Claimed Exemption from the Separate Rate Analysis

Next, Hilltop argues it was "improper to consider Hilltop part of the [China]-wide entity because Commerce has repeatedly confirmed that exporters located in Hong Kong and other market economy locations are exempt from the separate rate test and are *automatically granted separate rate status*." Appellants' Br.-1647, at 46–47; Appellants' Br.-1514, at 48 (emphasis added). The company says "Commerce's established policy is that exporters who are 100% foreign-owned and/or exporters who are located in a market economy country are not subject to the separate rate analysis and receive separate rate status *automatically*." Appellants' Br.-1647, at 48; Appellants' Br.-1514, at 49–50 (emphasis added).

Hilltop's claim that its Hong Kong location automatically entitles the company to a separate rate is flawed because it ignores the potential for government control through Hilltop's affiliates. Thus, the company's registration is not dispositive. While Hilltop points to examples where Commerce has accepted certifications that companies are free from government control without a full separate rate analysis, this does not mean Commerce must automatically grant separate rate status when a company's false representations regarding its corporate

structure call its certification into question, particularly when the company has affiliates located in nonmarket economy countries. Accordingly, Commerce properly concluded "[a]lthough Hilltop claims that it is a Hong Kong-based exporter and therefore placement in the [China]-wide Entity is inappropriate, the undisclosed affiliation and unreliability of information on the record prevent us from determining with certainty the ownership and/or control of Hilltop." *AR4 Remand Results* at 58; *AR5 1st Remand Results* at 36.

### V. Commerce's Selection of the Country-Wide Antidumping Duty Rate Was Supported by Substantial Evidence

Hilltop also challenges Commerce's corroboration of the AFA rate applied to Hilltop as part of the China-wide entity as unsupported by substantial evidence and contrary to law. Commerce selected the 112.81% rate as the China-wide rate in both the Fourth and Fifth Reviews, noting it was the lowest rate listed in the original antidumping petition, and was subsequently assigned as the China-wide rate in the investigation and each successive administrative review of the order.

As previously explained, Commerce sought to more fully explain its corroboration analysis on remand in both the Fourth and Fifth Reviews. Commerce began by reexamining its use of the petition rate as the China-wide rate in the underlying antidumping investigation. In the investigation, Commerce corroborated the petition rate by comparing it to the dumping margins calculated for a respondent called Allied Pacific Group ("Allied"), which Commerce found to be a significant producer of subject merchandise. In this analysis, Commerce found that "a significant percentage of Allied's [CONNUMs] [had] positive margins and that a significant volume of those CONNUMs had margins which exceeded the lowest Petition margin of 112.81 percent." *AR4 Remand Results* at 32; *AR5 2nd Remand Results* at 5. Accordingly, Com-

merce found the petition rate of 112.81% was relevant to the investigation and had probative value.

For purposes of the Fourth and Fifth Reviews, Commerce acknowledged the margins of the mandatory respondents in the investigation had changed following litigation, so it "revisited the record of the [investigation] to determine whether margins calculated in the Petition, and vetted and revised by [Commerce] at that time, remain relevant to the investigation and have probative value." *AR4 Remand Results* at 32; *AR5 2nd Remand Results* at 5. To this end, Commerce "examined the record evidence with respect to the revised margin calculations and . . . confirmed that although the final weighted-average margins may have been downwardly revised, significant percentages of positive, CONNUM-specific margins remain" and "significant volumes of CONNUM-specific margins continue to be higher than the lowest Petition margin of 112.81 percent for one respondent." *AR4 Remand Results* at 32–33; *AR5 2nd Remand Results* at 5.

Specifically, Commerce placed additional information on the record concerning margins calculated for Red Garden, a mandatory respondent in the investigation, which was also the largest single exporter of subject merchandise with the highest volume of sales during the period of investigation. The information consisted of a file (the "Red Garden Margin File") created using Red Garden's data from the original investigation as recalculated to reflect the changes resulting from both domestic litigation and the Section 129 Proceeding completed in March 2013. *AR4 Remand Results* at 35; *AR5 2nd Remand Results* at 7–8; *see also* J.A.-1647, at 3938–40; J.A.-1514, at 4168–70. The Red Garden Margin File listed every CONNUM-specific margin calculated for Red Garden. Commerce also supplemented the Red Garden Margin File with an analysis memo ("Red Garden 129 Analysis Memo") that accompanied Commerce's recalculation of

Red Garden's investigation margin for the Section 129 Proceeding. The memo included the complete output of the statistical analysis software used in recalculating Red Garden's margins. *AR4 Remand Results* at 35; *AR5 2nd Remand Results* at 8; *see* J.A.-1647, at 3963–4015; J.A.-1514, at 4193–245. Based on this information, Commerce determined the updated Red Garden dumping margins were relevant for purposes of corroboration of the 112.81% petition rate.

Commerce then analyzed Red Garden's sales data, factors of production data, and margin calculations, taking into account the revisions resulting from judicial review. This analysis revealed more than half of the CONNUMs in Red Garden's margin calculation had positive margins. "Of those CONNUMs with positive margins," Commerce found, "the percentage with dumping margins exceeding 112.81 percent is sufficient to demonstrate the probative value of the lowest Petition margin of 112.81 percent." *AR4 Remand Results* at 34; *AR5 2nd Remand Results* at 7. In addition, Commerce found that, by quantity, the "CONNUMs accounting for a significant volume of merchandise under consideration were sold at prices that resulted in margins which exceed 112.81 percent." *AR4 Remand Results* at 34; *AR5 2nd Remand Results* at 7. Therefore, Commerce concluded "the Petition rate [of 112.81%] continues to be relevant to this investigation, even after taking into account subsequent changes to the original calculations pursuant to remand redetermination, and the rate to be corroborated for purposes of [these remands]." *AR4 Remand Results* at 34; *AR5 2nd Remand Results* at 7.

Hilltop argues "neither the AFA rate from the petition nor the information Commerce used for its corroboration were probative of the commercial reality" during the Fourth and Fifth Reviews, and "Commerce disregarded record evidence demonstrating the unreliability of the small group of sales data from the original investigation

used for its corroboration." Appellants' Br.-1647, at 58; Appellants' Br.-1514, at 60–61. The company contends Commerce continues to use the outdated margin from the 2003 petition and corroborates that rate with equally outdated sales data from the original investigation. Furthermore, Hilltop contends there was "a wealth of information from more recent reviews (as well as recalculated margin results from the original investigation)," which demonstrate the 112.81% rate is not commercially reasonable. Appellants' Br.-1647, at 60; Appellants' Br.-1514, at 63. Therefore, Hilltop argues, it was unreasonable for Commerce to rely on the outdated information from the investigation to corroborate the petition rate.

Hilltop further argues "the unbroken history of calculated margins that are, at best, a mere fraction of the 112.81% petition rate" further undermines Commerce's corroboration of the AFA rate. Appellants' Br.-1647, at 61; Appellants' Br.-1514, at 63. Hilltop points to cooperative respondents in the investigation who received zero or de minimis margins after recalculation pursuant to the Section 129 Proceeding, as well as cooperative respondents in the First through Fourth Administrative Reviews, who with one exception received zero or de minimis margins. The company also points out that Red Garden's overall margin from the Section 129 Proceeding was zero. Therefore, to Hilltop, "[g]iven this history of extremely low margin results extending over multiple years, it is plainly evident that the 112.81% rate from the petition does not reflect commercial reality and is punitively high." Appellants' Br.-1647, at 61; Appellants' Br.-1514, at 64; *see also* Appellants' Br.-1647, at 62–63; Appellants' Br.-1514, at 65 ("Commerce is applying an AFA rate based on outdated and cherry-picked data that is over *twelve times* higher than the highest rate ever calculated for a cooperative respondent.").

Commerce properly corroborated its selection of the petition rate as the China-wide rate based on AFA. As to

Hilltop's claim that the relevancy of the information is undermined by its age, the age of information alone does not render the information unreliable, particularly when Commerce revisits that information with more recent data. Indeed, as the CIT noted, "Hilltop ignores judicial precedent holding that the continued reliability and relevance of data from prior segments of an antidumping proceeding is presumed absent rebutting evidence." *Ad Hoc Shrimp II*, 992 F. Supp. 2d at 1301 (citing *KYD*, 607 F.3d at 764–68). Here, Commerce corroborated the petition rate using information from the more recent Section 129 Proceeding and incorporated post-investigation changes due to domestic and international litigation. Thus, that the AFA rate was selected from the 2003 petition does not undermine its relevance in light of Commerce's detailed explanation of why the rate continues to be relevant based on updated record evidence. This is not to say that outdated data would continue to be reliable if there was available more recent data on the record for non-cooperating respondents, but here the data Hilltop points to is that of cooperative respondents. And the most recent China-wide rate was 112.81%, as it was used in the antidumping investigation and each successive administrative review of the antidumping duty order.

As to Hilltop's argument regarding the availability of lower margins calculated for cooperating respondents, the company's reliance on separate rates calculated for cooperative companies is unavailing. As the Government points out, "the fact that lower dumping margins have been calculated for respondents that have demonstrated their eligibility for a separate rate in certain segments of this proceeding has little bearing on the rate applied to the China-wide entity." Government's Br.-1647, at 67; Government's Br.-1514, at 69. Indeed, as the CIT found, "[i]n the [nonmarket economy] context, . . . the inference that the countrywide entity as a whole may be dumping at margins significantly above the cooperating separate

rate market participants is not unreasonable." *Ad Hoc Shrimp II*, 992 F. Supp. 2d at 1300. Furthermore, this court has clarified that AFA rates can be significantly higher than rates calculated for cooperating respondents, *see, e.g.*, *KYD*, 607 F.3d at 765–66 (affirming application of petition rate many times higher than those of cooperating respondents), particularly since such rates should reflect an "inference that is adverse to the interests of that party," 19 U.S.C. § 1677e(b). Indeed, "Commerce need not select, as the AFA rate, a rate that represents the typical dumping margin for the industry in question." *KYD*, 607 F.3d at 765–66.

In addition, Hilltop's argument that Commerce should rely on the rates assigned to mandatory respondents in the prior reviews ignores that these rates include those calculated for Hilltop itself during the time it concealed Ocean King, thus calling into question their reliability. Furthermore, Hilltop's claim that Commerce should have considered Red Garden's overall margin of zero would conflict with the stated purpose of AFA, which ensures an uncooperative "party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199. Indeed, as the Government states, "[t]he point of corroboration is to ensure that an adverse rate is relevant and probative, not to assign a rate to an uncooperative respondent as if it had cooperated." Government's Br.-1647, at 71; Government's Br.-1514, at 72; *see De Cecco*, 216 F.3d at 1032 (explaining that an AFA rate should be "a reasonably accurate estimate of the respondent's actual rate, [here, the China-wide entity,] *albeit with some built-in increase* intended as a deterrent to non-compliance" (emphasis added)).

Accordingly, Commerce reasonably relied on the significant volume of sales by the largest cooperating export-

er, Red Garden, to conclude a non-cooperative respondent could have made sales at the same rate. For this reason, substantial evidence supports Commerce's determination that the Red Garden sales data establish "the commercial reality that a significant quantity and value of CON-NUMs were sold at prices that resulted in [antidumping] margins exceeding 112.81 percent," which "confirms the continued reliability of the 112.81 percent rate and relevance to the [China]-wide entity as a whole." *AR4 Remand Results* at 41; *AR5 2nd Remand Results* at 14.

CONCLUSION

Accordingly, the decisions of the United States Court of International Trade are

**AFFIRMED**