# United States Court of Appeals for the Federal Circuit

---

**SUNPREME INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, SOLARWORLD AMERICAS, INC.,**
*Defendants-Cross-Appellants*

---

2018-1116, 2018-1117, 2018-1118

---

Appeals from the United States Court of International Trade in No. 1:16-cv-00171-CRK, Judge Claire R. Kelly.

---

Decided: January 7, 2020

---

JOHN M. GURLEY, Arent Fox, LLP, Washington, DC, for plaintiff-appellant. Also represented by DIANA DIMITRIUC QUAIA, NANCY NOONAN.

JUSTIN REINHART MILLER, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York, NY, for defendant-cross-appellant United States. Also represented by REGINALD THOMAS BLADES, JR., JEANNE DAVIDSON, JOSEPH H. HUNT, Washington, DC; MERCEDES MORNO, United States Department of Commerce, Washington, DC.

TIMOTHY C. BRIGHTBILL, Wiley Rein, LLP, Washington,

DC, for defendant-cross-appellant SolarWorld Americas, Inc. Also represented by TESSA V. CAPELOTO, LAURA EL-SABAAWI, USHA NEELAKANTAN, MAUREEN E. THORSON.

———————————————

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges.*[*]

Opinion for the court filed by *Chief Judge* PROST, in which *Circuit Judges* NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, TARANTO, CHEN, HUGHES, and STOLL, join.

PROST, *Chief Judge*.

Sunpreme Inc. appeals from the final decision of the United States Court of International Trade in favor of the United States and SolarWorld Americas, Inc., concluding that Sunpreme's solar modules are covered by the scope of antidumping and countervailing duty orders on U.S. imports of certain solar cells from the People's Republic of China. The United States and SolarWorld cross-appeal from the same decision, which also concluded that the United States Department of Commerce ("Commerce") could not instruct United States Customs and Border Protection ("Customs") to continue suspending liquidation of Sunpreme's solar modules entered or withdrawn from warehouse for consumption before the scope inquiry was initiated.

A unanimous panel of this court previously affirmed the portion of the Court of International Trade's decision upholding Commerce's scope ruling. *Sunpreme Inc. v. United States*, 924 F.3d 1198, 1212 (Fed. Cir. 2019) ("*Panel Opinion*"). A majority of that panel, addressing the cross-appeal brought by the United States and SolarWorld, also affirmed the Court of International Trade's conclusion that

———————————————

[*]    Circuit Judge Wallach did not participate.

Commerce's instructions to continue suspending liquidation of goods entered or withdrawn prior to the scope inquiry were unlawful. *Id.* at 1215.

The United States petitioned for en banc rehearing of its cross-appeal. We now grant that petition to resolve whether it is within Customs's authority to preliminarily suspend liquidation of goods based on an ambiguous antidumping or countervailing duty order, such that the suspension may be continued following a scope inquiry by Commerce. We conclude that it is.

Because we find that Commerce's instructions regarding continued suspension of liquidation were lawful and not reliant on *ultra vires* acts of Customs, we grant rehearing en banc limited to that issue, vacate the original panel opinion, and reverse that portion of the Court of International Trade's decision. Commerce's instructions are reinstated in full.

Although the original panel opinion is vacated due to our en banc consideration of the United States's cross-appeal, we reinstate the remaining portions of the panel opinion, including the affirmance of the Court of International Trade's conclusion that Commerce's final scope ruling is supported by substantial evidence. For the sake of completeness, the undisturbed portions of the panel opinion are reproduced below.[1]

BACKGROUND

I

Solar modules convert sunlight into electricity. Many solar modules are composed of crystalline silicon photovoltaic ("CSPV") cells. Those modules contain crystalline silicon wafers that are processed in the presence of other

---

[1]    Therefore, the en banc portion of this opinion consists only of Part II of the Discussion section.

chemicals so that one portion of the wafer has a negative charge (i.e., an n-type layer with excess electrons) and another portion has a positive charge (i.e., a p-type layer with excess electron holes). The existence of the positive and negative layers in a single wafer creates what is known in the industry as a "p/n junction." J.A. 325, 466, 546, 2719. A built-in electric field is created at and around the site of the p/n junction due to the electric charge differential. When sunlight strikes a CSPV cell, the light energy is absorbed, free electrons in the n-type layer attempt to unite with holes in the p-type layer at and around the p/n junction, and the resulting energy generated by the mobilized electrons is translated into usable electricity.

Other solar modules are composed of thin films. Those modules contain very slim layers of semiconductor material, such as amorphous silicon, deposited on a substrate of some sort, such as glass, stainless steel, or plastic. Some of the layers are doped with chemicals that create an excess of electron-donating impurities (i.e., n-type layers), while other layers are doped with chemicals that create an excess of hole-donating impurities (i.e., p-type layers). When the n-type and p-type layers are put in contact, they form a p/n junction, and a built-in electric field is created. The imposition of an additional semiconductor substrate (i.e., intrinsic layer) between the doped thin film layers forms what is known as a "p/i/n junction." J.A. 531, 546. With respect to p/i/n junctions, the electric field extends across the entire intrinsic region.

In 2011, SolarWorld filed a petition with Commerce and the United States International Trade Commission ("ITC") seeking the imposition of antidumping and countervailing duties on CSPV cells imported from the People's Republic of China, pursuant to §§ 701 and 731 of the Tariff Act of 1930. In 2012, following an investigation, Commerce issued antidumping and countervailing duty orders covering those imports. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's*

*Republic of China: Countervailing Duty Order* ("CVD Order"), 77 Fed. Reg. 73,017 (Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order* ("AD Order"), 77 Fed. Reg. 73,018 (Dec. 7, 2012). Both orders recite the same scope, which reads in relevant part as follows:

> The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

> This order covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

>                    . . . .

> Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

CVD Order, 77 Fed. Reg. at 73,017; AD Order, 77 Fed. Reg. at 73,018–19. Commerce notified Customs of the AD and CVD Orders ("the Orders") and required cash deposits or posting of a bond equal to the appropriate rate in effect at the time of entry for covered imports.

Sunpreme manufactures solar modules in China. Those modules contain bifacial solar cells that are composed of thin films, which are several layers of amorphous silicon less than one micron thick, deposited on both sides of a crystalline silicon wafer. Following publication of the Orders on December 2, 2012, Sunpreme entered its merchandise as entry type "01," meaning not subject to the Orders, and continued to do so without question from Customs until early 2015, when, for unknown reasons, Customs began to question whether Sunpreme's entries were covered by the Orders. Initially unsure whether the Orders covered Sunpreme's entries, Customs sought advice from one of its laboratories. On April 20, 2015, Customs notified Sunpreme that it had decided that Sunpreme's entries are covered by the Orders, thus resulting in the suspension of liquidation of Sunpreme's entries and the requirement that Sunpreme pay cash deposits in order for its shipments to be released from the port's warehouse. Although it objected to Customs' determination, Sunpreme complied.

Meanwhile, Customs continued to question whether Sunpreme's solar modules unambiguously fell within the scope of the Orders. On June 3, 2015, Customs contacted Commerce seeking guidance on whether Sunpreme's products were covered by the Orders. Commerce answered that

> a determination as to whether this product is covered by antidumping duty order A–570–979 and countervailing duty order C–570–980 [i.e., the Orders] would need to be made by the Department of Commerce in a scope ruling which can be requested by the importer or exporter.

*Sunpreme Inc. v. United States* ("*Sunpreme I CIT*"), 190 F. Supp. 3d 1185, 1191–92, 1199 (Ct. Int'l Trade 2016).

In a separate proceeding, Sunpreme filed a complaint with the United States Court of International Trade ("CIT") under 28 U.S.C. § 1581(i), directly challenging

Customs' determination that Sunpreme's solar modules are subject to the Orders. *Sunpreme Inc. v. United States* ("*Sunpreme I PI*"), 145 F. Supp. 3d 1271, 1282 (Ct. Int'l Trade 2016) (opinion granting preliminary injunction). In its final decision, the CIT found it undisputed that Sunpreme's solar modules contain layers of thin film, but that Customs' laboratory tests confirmed those modules also contain crystalline silicon. *Sunpreme I CIT*, 190 F. Supp. 3d at 1191, 1195–96. The CIT noted that, although the Orders expressly include "crystalline silicon photovoltaic cells" within their scope and expressly exclude "thin film photovoltaic products" from their scope, the Orders do not define the term thin film products. *Id.* at 1190, 1195, 1200. That led the CIT to characterize the scope language in the Orders as ambiguous with respect to Sunpreme's solar modules. *Id.* at 1203. The CIT concluded, based on our decisions in *AMS Associates, Inc. v. United States*, 737 F.3d 1338 (Fed. Cir. 2013), and *Xerox Corp. v. United States*, 289 F.3d 792 (Fed. Cir. 2002), that Customs lacked authority to interpret the scope of Commerce's ambiguous Orders, and thus Customs could not determine that Sunpreme's solar modules are subject to those duty orders. *Sunpreme I CIT*, 190 F. Supp. 3d at 1202–04; *accord Sunpreme I PI*, 145 F. Supp. 3d at 1283–92. We reversed on appeal because, under the circumstances presented, the CIT lacked jurisdiction under 28 U.S.C. § 1581(i) to entertain direct challenges to Customs' decision given that an alternative administrative remedy was available. *See Sunpreme, Inc. v. United States* ("*Sunpreme I*"), 892 F.3d 1186, 1192–94 (Fed. Cir. 2018) ("Section 1581(i) 'may not be invoked when jurisdiction under another subsection of § 1581 is or could have been available, unless the remedy provided under that other subsection would be manifestly inadequate.'" (quoting *Int'l Custom Prods., Inc. v. United States*, 467 F.3d 1324, 1327 (Fed. Cir. 2006))). That remedy was a scope ruling from Commerce interpreting the scope of the duty orders. *Id.*

II

A

On November 16, 2015, Sunpreme petitioned Commerce for a scope ruling to determine whether its solar modules are subject to the Orders. Sunpreme contended that the Orders do not cover its solar modules because they do not contain CSPV cells, they do not have a p/n junction, and they otherwise qualify for the Orders' exclusion because they are thin film products. On December 30, 2015, Commerce initiated a formal scope inquiry.

B

After the scope inquiry was initiated, but before a final ruling was made, Commerce issued a scope ruling in a separate proceeding deciding that Silveo, Inc.'s Triex photovoltaic cells are subject to the Orders. Like Sunpreme's solar modules, the Triex cells also contain a crystalline silicon substrate sandwiched between layers of amorphous silicon thin films.

Commerce's regulations at 19 C.F.R. § 351.225(k) establish its analytical path for deciding whether certain imports are covered by the scope of an antidumping or countervailing duty order. *See Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015). Commerce first examines the sources listed under § 351.225(k)(1), which include "the scope language contained in the order itself, the descriptions contained in the petition, and how the scope was defined in the investigation and in the determinations issued by Commerce and the ITC." *Id.* Those are known as the (k)(1) sources. If those sources are not sufficient to decide the matter, then Commerce turns to examining the sources listed under § 351.225(k)(2), which include the product's physical characteristics, ultimate purchasers' expectations, the ultimate use of the product, trade channels in which the product is sold, and the manner in which the

product is advertised and displayed. *Id.* Those are known as the (k)(2) sources.

Commerce determined that the (k)(1) sources were not dispositive as to whether the Triex cells fell within the scope of the Orders. It said the language of the Orders was ambiguous and the other sources did not resolve whether p/i/n junctions qualify as p/n junctions or whether products containing both thin films and crystalline silicon components qualify for the thin film exclusion. Commerce correctly concluded that the hybrid Triex cells "are neither dispositively covered nor clearly excluded from the scope of the Orders." J.A. 884.

Commerce then concluded that, based on (k)(2) sources, the Triex cells are covered by the Orders. It said the Triex cells contain a p/n junction formed by any means because "a p/i/n junction is simply a type of p/n junction" in which the electric field is extended over a wider region of the cell. J.A. 870–71 (internal quotation marks omitted). It concluded the presence of an intrinsic layer does not change the function of the p/n junction. Moreover, Commerce explained that conventional thin film cells were designed to avoid the use of crystalline silicon, and thus allowing products using crystalline silicon as an active, energy-producing component to qualify for the thin film exclusion "would result in a physical description that would easily permit circumvention of the scope of the Orders." J.A. 871–72.

Commerce placed the Triex scope ruling on the record in the Sunpreme proceeding so that interested parties could comment on any relevant distinctions between Sunpreme's solar modules and the Triex product.

## C

In July 2016, Commerce issued its final scope ruling with respect to Sunpreme's solar modules. Like the Triex hybrid cells, Commerce understood that Sunpreme's solar modules were neither covered nor clearly excluded by the

descriptions contained in the Orders. Based solely on (k)(1) sources, it concluded that Sunpreme's hybrid bifacial thin film cells are subject to the Orders. It concluded that Sunpreme's solar modules contain CSPV cells because they actively rely on crystalline silicon wafers to generate electricity and absorb sunlight, just like the crystalline silicon component in the Triex product. It also determined that the CSPV cells, which include all the active, energy-generating components such as the thin films and crystalline silicon wafers, are at least twenty micrometers thick. Furthermore, Commerce decided that Sunpreme's solar modules contain a p/n junction because, as it said in the Triex scope ruling, a p/i/n junction is just a form of p/n junction that does not change the function or nature of the p/n junction in the CSPV cell. Finally, it concluded that Sunpreme's solar modules do not qualify for the thin film exclusion because, as it said in the Triex scope ruling, the mere presence of some thin film layers does not override the significance of the crystalline silicon wafer and thus cannot thereby circumvent the Orders.

Commerce then issued instructions to Customs ordering it to continue suspending liquidation of Sunpreme's solar modules imported pre-scope inquiry and to begin suspending liquidation and collecting cash deposits at the applicable rate for any relevant products Sunpreme entered or withdrew from warehouse for consumption on or after December 30, 2015. That date is when Commerce initiated the scope proceedings.

D

Sunpreme filed a complaint in the CIT challenging Commerce's final scope ruling and its instructions to Customs. It argued that Commerce's final scope ruling is unsupported by substantial evidence and that its instructions to Customs should not have applied retroactively to solar modules entered before the scope inquiry was initiated. The CIT upheld Commerce's final scope ruling as in

accordance with law and supported by substantial evidence, but it invalidated as contrary to law that part of Commerce's instructions to Customs ordering continued suspension of liquidation for entries pre-dating the initiation of the scope inquiry. *Sunpreme Inc. v. United States* ("*Sunpreme II CIT*"), 256 F. Supp. 3d 1265, 1278, 1292, 1294 (Ct. Int'l Trade 2017).

With respect to the final scope ruling, the CIT explained that substantial evidence supports each of Commerce's four main determinations: that Sunpreme's solar modules contain CSPV cells, are at least twenty micrometers thick, have a p/n junction, and do not qualify for the thin film exclusion. *Id.* at 1278–91. It agreed that the Orders, the petition, the initial investigation, and the Triex scope ruling provided evidentiary support for Commerce's decision. *Id.*

With respect to Commerce's instructions to Customs, however, it held that it was unlawful for Commerce to order continued suspension of liquidation and collection of cash deposits for entries made before the scope inquiry was initiated. *Id.* at 1291–94. The CIT held that Customs' suspension of liquidation was *ultra vires* because Customs made its decision before the Sunpreme scope inquiry was completed, at which time Customs lacked authority to interpret the Orders to determine whether Sunpreme's solar modules fell within the scope of those Orders. *Id.* The CIT again relied on *AMS*, 737 F.3d 1338, and *Xerox*, 289 F.3d 792, to support its judgment that Customs lacked authority to interpret the Orders for suspension of liquidation purposes. *Id.* at 1292. The CIT therefore concluded that "Commerce could not extend the suspension of liquidation on entries that were not appropriately administratively suspended." *Id.* at 1293. It held that Commerce only has authority to "continue" a lawful suspension of liquidation. *Id.*

Sunpreme now appeals the CIT's decision upholding Commerce's scope ruling. The United States and

SolarWorld cross-appeal the CIT's partial invalidation of Commerce's instruction to Customs to the extent that it directed suspension of liquidation pre-dating the initiation of the scope inquiry. We have jurisdiction to decide the appeals under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review CIT decisions de novo and apply anew the same standard it used. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015); *Atl. Sugar, Ltd. v. U.S.*, 744 F.2d 1556, 1559 n.10 (Fed. Cir. 1984). Under that standard, we "must uphold Commerce's determinations unless they are 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Ad Hoc Shrimp*, 802 F.3d at 1348 (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). While our review repeats much of the work of the CIT, we do not ignore the CIT's informed judgment. *Id.* Moreover, we give substantial deference to Commerce's interpretation of its own duty orders "because the meaning and scope of [those] orders are issues 'particularly within the expertise' and 'special competence' of Commerce." *King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998)).

A decision is supported by substantial evidence if the evidence amounts to "more than a mere scintilla" and "a 'reasonable mind might accept [it] as adequate to support a conclusion.'" *Ad Hoc Shrimp*, 802 F.3d at 1348 (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 217 (1938)). Commerce's findings "may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Id.*

Two main issues are presented for our review. First, Sunpreme argues that Commerce's determination that its solar modules are covered by the scope of the Orders is not supported by substantial evidence. Second, the United States and SolarWorld contend that Commerce's

instructions to Customs were not unlawful and should have been upheld in all respects. We address those issues in turn below.

I

Sunpreme's only challenge on appeal is that the CIT incorrectly concluded that Commerce's decision that Sunpreme's solar modules are covered by the Orders is supported by substantial evidence. The United States and SolarWorld disagree.

Commerce issues scope rulings to clarify the scope of its antidumping and countervailing duty orders. 19 C.F.R. § 351.225(a). As noted above, the analysis for Commerce's scope rulings is governed by its regulations at 19 C.F.R. § 351.225. "Commerce must first examine the language of the final order." *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013). If the language is unclear, then Commerce must turn to available (k)(1) sources, including the petition, the initial investigation, and any earlier determinations by Commerce and the ITC. *Id.*; 19 C.F.R. § 351.225(k)(1). If the matter remains unresolved, Commerce must turn to available (k)(2) sources, including the product's physical characteristics, ultimate purchasers' expectations, the product's ultimate use, the channels of trade in which the product is sold, and the way the product is marketed. *Mid Continent*, 725 F.3d at 1302; 19 C.F.R. § 351.225(k)(2).

While "review of the petition and the investigation may provide valuable guidance as to the interpretation of the final order," those sources "cannot substitute for language in the order itself." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002). The scope of an order can encompass certain "merchandise only if [the order] contain[s] language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Id.* at 1089. Similarly, "merchandise facially covered by an order may not be excluded from the scope of the order

unless the order can reasonably be interpreted so as to exclude it." *Mid Continent*, 725 F.3d at 1301 (emphasis omitted). At bottom, while Commerce has "substantial freedom to interpret and clarify its antidumping [and countervailing duty] orders," it may not do so in a way that changes them. *Id.* at 1300 (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1269 (Fed. Cir. 2002)).

Sunpreme attacks all four parts of Commerce's scope determination. First, it argues its solar modules are not CSPV cells. Second, it contends they are far less than twenty micrometers thick. Third, it asserts they do not contain a p/n junction. Last, it argues they qualify for the Orders' thin film exclusion. Because none of Sunpreme's arguments is persuasive, we conclude, as the CIT did, that Commerce's final scope ruling is supported by substantial evidence.

## A

Sunpreme argues that substantial evidence does not support Commerce's conclusion that its solar modules contain CSPV cells. It argues that Commerce's decision to treat any product relying on crystalline silicon to generate electricity as a CSPV cell is contrary to law because it introduces criteria into the scope of the Orders that are not covered by their plain language or any (k)(1) sources. Moreover, it contends that Commerce was wrong when it stated that the crystalline silicon wafers in Sunpreme's solar modules play a primary role in the modules' generation of electricity. Finally, Sunpreme asserts that its crystalline silicon wafers are not doped and thus can produce no more electricity than a sliver of river rock.

The United States and SolarWorld respond that Commerce correctly concluded that Sunpreme's solar modules contain CSPV cells. They identify record evidence they allege shows that Sunpreme's solar modules contain a doped crystalline silicon substrate that serves a primary role in absorbing sunlight, which according to the Triex scope

ruling is enough to conclude that those modules contain CSPV cells. They argue Sunpreme simply wishes for us to reweigh the evidence and reach a different conclusion.

We agree with the United States and SolarWorld that substantial evidence supports Commerce's conclusion that Sunpreme's solar modules contain CSPV cells. Commerce determined that a CSPV cell is a solar product that relies on crystalline silicon to generate electricity. That is a reasonable interpretation of the Orders based on their plain language and (k)(1) sources. The Orders expressly cover "crystalline silicon photovoltaic cells" without much relevant further limitation. CVD Order, 77 Fed. Reg. at 73,017; AD Order, 77 Fed. Reg. at 73,018. The petition states that "CSPV cells . . . are made from crystalline silicon" and "convert the energy of sunlight directly into electricity, by the photovoltaic effect." J.A. 237. And Commerce determined in the Triex scope ruling that the basic purpose of solar cells as opposed to blank crystalline silicon wafers is electricity generation, and thus a crystalline silicon substrate that contributes to energy generation when the device is struck by sunlight constitutes a CSPV cell.

The record supports Commerce's decision that Sunpreme's solar modules rely on crystalline silicon in the electricity generation process. In the Triex scope ruling, Commerce explained that traditional CSPV cells contain a "semi-conduction and photon collection region . . . between the positively and negatively doped layers of the wafer itself," and that the crystalline silicon wafer in the Triex cells serves the same purpose because "the wafer is part of the 'circuit' between the p/n layers of thin film, creating a region of semi-conduction and photon collection between the thin film layers." J.A. 871. In both instances, the wafer contributes to "electricity generation between the positively and negatively doped regions of the cell." J.A. 871. It is active because it is slightly doped and plays a critical role in the energy-generating function of the cells.

The same is true for Sunpreme's solar modules. Sunpreme said that "the role of the wafer substrate [in its solar modules] is primarily to provide a light absorbing material and a stable mechanical/thermal interface for the amorphous silicon cells." J.A. 4575. It also admitted that its crystalline silicon wafers are naturally slightly doped, meaning they have a slight inherent p-type or n-type orientation. J.A. 4574, 4773. And Sunpreme has not identified any evidence that, given those characteristics, the crystalline silicon wafers in its solar modules do not operate just like the wafers in the Triex cells, which formed part of the energy-generating circuit by "creating a region of semi-conduction and photon collection between the thin film layers." It was thus reasonable for Commerce to conclude that Sunpreme's solar modules contain CSPV cells because the active crystalline silicon wafers in those products absorb sunlight, are slightly doped, and largely serve the same function as the crystalline silicon in traditional CSPV cells.

We are not persuaded by Sunpreme's arguments to the contrary. Commerce's determination that CSPV cells are those that rely on crystalline silicon to generate electricity does not add a new criterion to the scope of the Orders because the scope language can reasonably bear, and the (k)(1) sources reasonably support, Commerce's interpretation. Whether the crystalline silicon wafer is doped or acts as a primary solar absorber are not new criteria, but instead serve as exemplary guideposts for identifying the purpose and function of the wafer, which is to contribute to the generation of energy in the modules. Additionally, even if the crystalline silicon wafers in Sunpreme's solar modules are not the primary solar absorbers in the cells, Commerce could have reasonably concluded that it is enough that the wafers provide for and are primarily used for absorbing sunlight. Finally, while Sunpreme would have everyone believe that its crystalline silicon wafers are inert, useless slivers of river rock that play no role in the

energy-production process, the wafers are naturally slightly doped and, when used in conjunction with the rest of the solar module's components, play a critical role in the generation of energy. J.A. 245–55, 304–06, 325–27, 871. We therefore agree with the CIT that substantial evidence supports Commerce's conclusion that Sunpreme's solar modules contain CSPV cells.

B

Sunpreme argues that its solar modules do not contain cells that are at least twenty micrometers thick. It argues the thin film layers are far less than twenty micrometers thick and the much thicker crystalline silicon substrate must be excluded from the calculation given that it is not an active part of the devices. Because we uphold Commerce's conclusion that the crystalline silicon wafer in Sunpreme's solar modules are indeed an active part of those devices, Sunpreme's thickness argument necessarily fails. We agree with the CIT that Commerce's ruling that Sunpreme's solar modules have cells that are at least twenty micrometers thick is supported by substantial evidence.

C

Sunpreme also argues that substantial evidence does not support Commerce's conclusion that its solar modules have a p/n junction. It contends that the term "p/n junction" as used in the Orders does not require interpretation because it unambiguously refers to p-type layers directly adjacent to or abutting n-type layers formed within the crystalline silicon wafer itself. It asserts that its solar modules do not have a p/n junction because the thin films form p/i and i/n junctions outside the wafer substrate and a p/i/n junction is not a p/n junction.

The United States and SolarWorld counter that Commerce correctly concluded that Sunpreme's solar modules contain a p/n junction. They argue that the Triex scope ruling is a (k)(1) source that supports treating p/i/n

junctions as a subset of p/n junctions, and that the form of junction should not be elevated over its function. They also contend that neither the plain language of the Orders nor any (k)(1) sources limits the location of the p/n junction to inside the crystalline silicon component.

We agree with the United States and SolarWorld that substantial evidence supports Commerce's conclusion that Sunpreme's solar modules contain a p/n junction. The language of the Orders, as well as several (k)(1) sources, support Commerce's determination that a p/i/n junction is a type of p/n junction because the function and nature of the junction, which is the formation of an electric field, is unchanged by introducing an intrinsic crystalline silicon layer between positive and negative thin films. The Orders provide that covered merchandise must contain "a p/n junction formed by any means . . . ." CVD Order, 77 Fed. Reg. at 73,017; AD Order, 77 Fed. Reg. 73,018. Their express language in no way limits the location, form, or method of production of the p/n junction.

The original petition describes the p/n junction as "an interface of a p-type semiconductor and an n-type semiconductor that is usually formed by dopant additions to create an intrinsic or extrinsic charge state." J.A. 237–38. It states the junction could be heterogenous with various sections of the substrate responding differently to sunlight, homogenous, or patterned. J.A. 238. It also notes that the p/n junction could be formed by several means and recites a non-exhaustive list that includes dopant diffusion, ion implanation, epitaxial growth, and bonding of dissimilar materials. J.A. 238 n.14. SolarWorld later revised its petition to state that the duty orders cover cells "having a p/n junction formed by any means," without reference to a specific list of possible formation methods. J.A. 816. SolarWorld explained that its change was meant to clarify that the p/n junction could be formed in any number of ways and at any one of numerous points in the manufacturing process of the cells. Again, like the language of the Orders,

the petition does not limit the location, form, or method of production of the p/n junction.

The Triex scope ruling states that a p/i/n junction simply is a type of p/n junction because it is one of many possible means of forming the necessary electric field. That is, the intrinsic crystalline silicon substrate connects the p-type and n-type thin film layers so that the cell functions in the same way as p/n junctions formed by other means. The intrinsic layer just "'extends the electric field over a wider region of the cell' (*i.e.*, the crystalline silicon wafer region . . .)." J.A. 871 (citation omitted). Additionally, in the Triex scope ruling, Commerce soundly and logically rejected the argument that the crystalline wafer is inert and thus plays no role in the electricity generation process because, if that were true, the substrate could be replaced with less expensive material than crystalline silicon that would clearly fall outside the scope of the Orders. Therefore, the language of the Orders and the (k)(1) sources support Commerce's interpretation.

Here, Sunpreme's solar modules contain a p/i/n junction formed by p-type and n-type thin films sandwiched atop both sides of an intrinsic crystalline silicon wafer. Substantial evidence therefore supports Commerce's conclusion that Sunpreme's solar modules contain a p/n junction, which encompasses p/i/n junctions.

Sunpreme's arguments to the contrary do not convince us otherwise. First, the term "p/n junction" is not unambiguously defined in the Orders. The petition's use of the word "interface" to describe the boundary between the p-type and n-type layers that creates the p/n junction does not necessarily mean that the layers must be in direct contact without the presence of an intervening intrinsic layer. CVD Order, 77 Fed. Reg. at 73,017; AD Order, 77 Fed. Reg. at 73,018. Additionally, the fact that glossaries define both p/n and p/i/n junctions does not mean that the two are mutually exclusive, for the same reason that a dictionary's

separate definitions for flower and tulip do not connote absolute distinctiveness.

Second, Sunpreme is incorrect in its insistence that the p/n junction must be located within the crystalline silicon wafer itself.  Neither the language of the Orders nor any (k)(1) source limits the location of the p/n junction, and Commerce expressly rejected the same argument in its earlier Triex scope ruling.  The fact that the petition originally included a list of means that was later removed is unhelpful to Sunpreme's argument because the removal broadens the methods of formation that previously were delineated in a non-exhaustive list.  Furthermore, a SolarWorld representative's statement during the ITC conference that the p/n junction is created within the silicon base material does not conflict with a junction formed by p-type thin films, n-type thin films, and an intrinsic substrate relating the two. The p/n junction is in all those components, including the base material itself, and cannot be seen.

Third, we are not persuaded by Sunpreme's attempt to distinguish the Triex scope ruling based on perceived differences in the cells.  Both Sunpreme's solar modules and the Triex cells have p/i/n junctions formed by thin films laid atop a crystalline silicon substrate, wherein the crystalline silicon substrate facilitates the creation of an electric field between the thin film layers.  Any other differences between the cells, including the location of the junction or the method of formation, do not bear on our analysis for the reasons stated above.

Finally, Sunpreme's effort to analogize the facts of this case to the facts in *Duferco* is fruitless.  In *Duferco*, Commerce interpreted a floor plate product with patterns in nonrectangular cross-sections achieved from a rolling process to be within the scope of an order covering flat-rolled products of nonrectangular cross-section where the cross-section was achieved only after rather than during the rolling process.  296 F.3d at 1095.  We held that Commerce's

interpretation was unlawful because it was completely untethered from the language of the order. *Id.* at 1095, 1098. We reasoned that merchandise may only be included within an order's scope if that order contains language specifically targeting the subject merchandise or capable of being reasonably interpreted to include such merchandise. *Id.* at 1089. The same facts do not exist here. Unlike the duty order in *Duferco*, which did not include any language that could act as a hook for the subject merchandise, the Orders expressly contemplate products having a p/n junction formed by any means, which for the reasons stated above can be reasonably interpreted to include p/i/n junctions.

We therefore agree with the CIT that substantial evidence supports Commerce's conclusion that Sunpreme's solar modules contain a p/n junction.

## D

Sunpreme argues that Commerce's ruling that Sunpreme's solar modules do not qualify for the thin film exclusion in the Orders is not supported by substantial evidence. It argues that Commerce rewrote the scope of the exclusion by interpreting it as not covering solar products containing active crystalline silicon wafers because the language of the exclusion and (k)(1) sources do not suggest discriminating among products based on the thin film substrate. It contends that its solar modules are thin films based on their industry certification, their size, and the way in which they are produced. Finally, Sunpreme asserts that SolarWorld's statements during the ITC conference demonstrate the scope of the exclusion is broader than Commerce's interpretation because there is no overlap between thin films and crystalline silicon cells, and the only competitive injury contemplated by the industry was with respect to crystalline silicon products rather than thin films.

The United States and SolarWorld respond that Commerce correctly interpreted the thin film exclusion as not extending to Sunpreme's solar modules. They argue that the language of the exclusion in the Orders is capable of bearing a narrow interpretation and (k)(1) sources support that understanding. Additionally, they encourage us to discount the value of the industry certifications Sunpreme identifies with respect to its solar modules because those modules are certified as both crystalline silicon and thin film products. Finally, SolarWorld argues that Sunpreme misconstrues its representative's statements at the ITC conference.

Substantial evidence supports Commerce's conclusion that Sunpreme's solar modules do not qualify for the thin film exclusion. It was a reasonable interpretation of the Orders, based on their plain language and (k)(1) sources, for Commerce to determine that the thin film exclusion does not protect those products that have both thin films and an active crystalline silicon wafer. The Orders provide that the covered merchandise "is crystalline silicon photovoltaic cells" and the excluded merchandise includes "thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS)." CVD Order, 77 Fed. Reg. at 73,017; AD Order, 77 Fed. Reg. at 73,018. The petition clearly states that thin film products "do not use crystalline silicon . . . ." J.A. 551. And the ITC asserted in its investigation that "CSPV products and thin film products have different chemical compositions and physical characteristics that affect the inherent properties of each and may limit their interchangeability," making particular note that traditional CSPV cells are made from crystalline silicon and are more efficient while thin films are typically made of amorphous silicon or non-silicon materials. J.A. 309, 326–27. The ITC also determined in its investigation that thin film products tend to use glass substrates or a flexible substrate such as

stainless steel or plastic. Those sources strongly suggest that thin films do not incorporate crystalline silicon.

Moreover, in the Triex scope ruling, Commerce distinguished CSPV cells from thin film products for purposes of the Orders. Relying on the petition and the ITC's initial investigation, Commerce said conventional thin films were designed to avoid the use of crystalline silicon and instead use a-Si, CdTe, or CIGS on a non-functional substrate like glass. It determined that the Triex cells do not qualify for the thin film exclusion because they "contain a crystalline silicon component that contributes to their photovoltaic function." J.A. 871.

Because there is no dispute that Sunpreme's solar modules contain crystalline silicon, and the evidence demonstrates that the crystalline silicon plays an active role in the cells energy generation processes as stated above, Sunpreme's solar modules do not qualify for the thin film exclusion. We agree with the CIT's decision to uphold Commerce's interpretation of the Orders because allowing any product that contains any thin film layer to qualify for the thin film exclusion "would result in a physical description that would easily permit circumvention of the scope of the Orders." J.A. 872.

Sunpreme's arguments trying to chip away at Commerce's reasonable conclusion are unpersuasive. First, Commerce's interpretation does not rewrite the scope of the thin film exclusion by defining it based on the substrate used, but instead its interpretation reasonably construes the exclusion to prevent it from covering products that are drawn to the central focus of the Orders: active crystalline silicon. Second, although SolarWorld's representative stated at the ITC conference that it was not concerned with certain hybrid solar cell products that used both crystalline silicon wafers and amorphous silicon thin film layers, he noted that his lack of concern was merely because those hybrid products were limited in availability and

production. Earlier in the conference, SolarWorld stressed that thin film technologies are "completely separate" from crystalline silicon products and the two do not overlap in their application. J.A. 370. Last, even if Sunpreme's solar modules are certified by the International Electrotechnical Commission as thin film products, we are not persuaded that the scope of the Orders is dictated by or otherwise tethered to such industry certifications. We therefore conclude that substantial evidence supports Commerce's determination that Sunpreme's solar modules are not excluded thin films.

In sum, we agree with the CIT that substantial evidence supports Commerce's final scope ruling. Sunpreme's solar modules are covered by the Orders.

## II

We now turn to the cross-appeal filed by the United States and SolarWorld which is the subject of the petition for rehearing en banc, asking us to reinstate the portion of Commerce's instructions to Customs held invalid by the CIT.

Commerce issued the Orders in December 2012. Despite the Orders, Sunpreme identified its imported modules as type 01 entries, meaning that the entries were not subject to antidumping and countervailing duties. In April 2015, however, Customs began to question Sunpreme's identification of its products as type 01 entries. Customs determined that the products were in fact covered by the Orders and, beginning on April 20, 2015, directed Sunpreme to instead enter its products as type 03 entries, which require payment of antidumping and countervailing duty cash deposits. In the hopes of avoiding this treatment, Sunpreme requested a scope inquiry to determine whether its products were in fact within the scope of the Orders. Commerce initiated a formal scope inquiry on December 30, 2015. At the conclusion of the scope inquiry, Commerce determined that Sunpreme's modules did in fact fall within

the scope of the Orders. Accordingly, Commerce instructed Customs to continue the suspension of liquidation and collection of cash deposits for Sunpreme modules, which had begun in April 2015. Sunpreme challenged those instructions at the CIT.

The CIT vacated Commerce's instructions in-part, holding that the suspension of liquidation could not lawfully cover modules entered prior to the initiation of a formal scope inquiry on December 30, 2015. A panel majority of this court agreed. *Panel Opinion*, 924 F.3d at 1215–16. The United States now asks us en banc to reverse that conclusion, and to reimpose the portion of Commerce's instructions suspending liquidation for entries between April 20, 2015 and December 30, 2015.

A

Under the clear and unambiguous terms of the relevant regulation, when Commerce conducts a scope inquiry "and the product in question is already subject to suspension of liquidation, that suspension of liquidation *will be continued*" pending the final scope ruling. 19 C.F.R. § 351.225(l)(1) (emphasis added). When Commerce issues a final scope ruling "to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) *will continue*." 19 C.F.R. § 351.225(l)(3) (emphasis added). If there has been no previous suspension of liquidation, and the final scope ruling is that the product is covered by the order, then Commerce is instead commanded by subsection (l)(3) to instruct Customs to suspend liquidation and collect the requisite cash deposit "for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption *on or after the date of initiation of the scope inquiry*." *Id.* (emphasis added). Alternatively, if the final scope ruling is that the product in question was not within the scope of the order, subsection (l)(3) provides that Commerce will order any previous suspension of liquidation

ended and instruct Customs to refund cash deposits already made or release any bonds relating to the product.

Customs began suspending liquidation of Sunpreme's subject solar modules on April 20, 2015, prior to the initiation of the scope inquiry. Under a straightforward application of subsection (l)(1), that suspension of liquidation "continued" through the duration of the scope inquiry. When Commerce issued its final scope ruling confirming that the modules were within the scope of the Orders, subsection (l)(3) required that the existing "suspension of liquidation under paragraph (l)(1) . . . will continue." Consistent with that regulation, Commerce instructed that Customs should continue its suspension of liquidation for entries dating back to April 20, 2015. As a result, Sunpreme was required to pay antidumping duties for products falling within the Orders beginning with the initial suspension of liquidation on April 20, 2015.

The CIT, however, did not reach this result. Instead, it held that the suspensions of liquidation beginning in April of 2015 were *ultra vires* acts by Customs because they required Customs to interpret ambiguous orders, and therefore were of no legal effect. *Sunpreme II CIT*, 256 F. Supp. 3d at 1292. Citing our decisions in *AMS Associates., Inc. v. United States*, 737 F.3d 1338 (Fed. Cir. 2013) and *Xerox Corp. v. United States*, 289 F.3d 792 (Fed. Cir. 2002), the CIT concluded that Customs "lacks the authority to interpret ambiguous scope language." *Sunpreme II CIT*, 256 F. Supp. 3d at 1292. Therefore, the CIT held, no valid suspensions of liquidation existed that could be "continued" during the scope inquiry under subsection (l)(1). With no legally effective ongoing suspensions of liquidation, Commerce would have instead faced the situation under subsection (l)(3) "where there has been no suspension of liquidation." In that instance, Commerce's instructions to Customs would be limited to products "entered on or after the date of initiation of the scope inquiry," here December 30, 2015. Based on its interpretation of our caselaw, the

CIT vacated the portion of Commerce's instructions that would have continued the suspension of liquidation for modules entered prior to that date.

The question before us, then, is whether Customs acted within its authority when it initially interpreted the Orders to cover Sunpreme's solar modules and began suspension of liquidation. If it did, Sunpreme is required to pay antidumping and countervailing duties on products imported on or after April 20, 2015 (when Customs first determined that Sunpreme's modules were within the scope of the Orders and began collecting cash deposits). However, if Customs exceeded its authority when it interpreted the Orders, then Sunpreme is only required to pay duties on products imported on or after December 30, 2015 (the date the scope inquiry was initiated). Sunpreme would thus be refunded its cash deposits for modules imported between April 20 and December 30, despite our conclusion in Part I that Sunpreme's modules are within the scope of the Orders.

For the reasons explained below, we break from the CIT and the prior panel opinion in this case, and now hold that Customs did not exceed its authority by ordering the suspension of liquidation based on its interpretation of the Orders. Customs has a statutory responsibility to fix the amount of duty owed on imported goods. *See* 19 U.S.C. § 1500(c). As part of that responsibility, Customs is both empowered and obligated to determine in the first instance whether goods are subject to existing antidumping or countervailing duty orders. While Customs may not expand or alter the scope of such orders, its authority and responsibility to determine whether they apply does not dissipate simply because an order lacks perfect clarity. Contrary to the CIT's conclusion, Customs's yes-or-no answer to whether an order applies does not invade the interpretive province of Commerce. Any other result would significantly limit Customs's ability to perform its statutory role

and would encourage gamesmanship by importers hoping to receive the type of windfall that Sunpreme seeks here.

B

The Tariff Act of 1930 requires Commerce to impose two types of duties on imports of goods that may injure domestic industries. When "foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," Commerce imposes an antidumping duty. 19 U.S.C. § 1673. Similarly, when a foreign government subsidizes the manufacture or export of goods imported or sold into the United States, Commerce imposes a countervailing duty. *See* 19 U.S.C. § 1671.

When goods are imported into the United States, Customs is obligated to "fix the final amount of duty to be paid on such merchandise and determine any increased or additional duties, taxes, and fees due." 19 U.S.C. § 1500(c). That obligation necessarily requires Customs to make a determination as to whether existing antidumping or countervailing duty orders apply to the subject goods. *See Mukand Int'l, Ltd. v. U.S.*, 502 F.3d 1366, 1367 (Fed. Cir. 2007) (noting that after Commerce has issued an antidumping duty order "Customs is thereafter responsible for applying and enforcing the order"); *Xerox*, 289 F.3d at 794 ("When merchandise may be subject to an antidumping duty order, Customs makes factual findings to ascertain what the merchandise is, and whether it is described in an order."). Neither section 1500 nor any related provision limits that obligation to the circumstance in which the order is clear and unambiguous. To the contrary, such a limitation would prevent Customs from performing its statutory obligations to "fix the final amount of duty" and "collect any increased or additional duties and fees due." 19 U.S.C. §§ 1500(c), 1505(b). Indeed, Customs is legally prohibited from releasing goods that are subject to an antidumping or countervailing duty order, ambiguous or not, unless the importer pays a cash deposit. *See* 19 U.S.C.

§ 1671h ("[F]or all entries . . . of merchandise subject to a countervailing duty . . . no customs officer may deliver merchandise of that class or kind to the person by whom or for whose account it was imported unless that person . . . deposits with the appropriate customs officer an estimated countervailing duty"); § 1673g(a) (providing the same for antidumping duties). Nothing in this statutory scheme suggests that Customs may simply ignore ambiguous orders when it "fix[es] the final amount of duty" owed on goods. 19 U.S.C. § 1500(c).

Our conclusion is further bolstered by section 1514(b), which provides that "determinations of the Customs Service," including whether goods fall within the scope of an antidumping or countervailing duty order, "are final and conclusive" unless appealed to Commerce. 19 U.S.C. § 1514(b); *see also Fujitsu Ten Corp. v. United States*, 957 F. Supp. 245, 248 (Ct. Int'l Trade 1997) (Wallach, J.) ("The statute recognizes Customs makes the initial determination that an existing antidumping order applies to a specific entry of merchandise. The statute states that such a decision is 'final and conclusive' unless it is appealed by petition to Commerce." (citations omitted)). We see little room for an interpretation in which Customs is tasked by section 1500 to "fix the final amount of duty," and by section 1514 to do so "final[ly] and conclusive[ly]," but is implicitly prohibited from doing so in cases that are less than perfectly clear.

Any other result would also be inconsistent with 19 C.F.R. § 351.225(l). That regulation expressly contemplates a scenario in which products are "subject to suspension of liquidation" at the direction of Customs, but Commerce later initiates a scope inquiry and issues a "final scope ruling [] to the effect that the product in question is not included within the scope of the order" (i.e., that Customs's initial determination was incorrect). *See id.* Such a regulation would be largely unnecessary if Customs was

only empowered to suspend liquidation where orders were clear and unambiguous.

C

We recognize that the CIT's conclusion and Sunpreme's arguments are rooted not in the language of any statute or regulation, but in our caselaw.  As discussed below, however, we do not agree that either of the cases relied upon prohibit Customs from suspending liquidation based on an ambiguous order.

The CIT, relying on *AMS Associates., Inc. v. United States*, 737 F.3d 1338 (Fed. Cir. 2013), stated that:

> where an unclear order renders a product not subject to an existing order and Commerce clarifies ambiguous scope language to determine that the merchandise is subject to the antidumping order, "the suspension of liquidation and imposition of antidumping cash deposits may not be *retroactive* but can only take effect on or after the date of the initiation of the scope inquiry."

*Sunpreme II CIT*, 256 F. Supp. 3d at 1292 (quoting *AMS*, 737 F.3d at 1344) (emphasis original to *AMS*).  Applying that holding to this case, however, contorts the meaning of the terms "not subject to an existing order" and "retroactive" in a manner that runs contrary to *AMS* itself.

In *AMS*, Customs made an initial determination that the goods in question were "not subject to the antidumping duty order."  *Id.* at 1340.  As a result, "those entries were consequently not subject to antidumping deposits."  *Id.*  In a later administrative review, Commerce "clarified" the scope of the order, to the effect that the goods fell within its scope.  As a result, Commerce issued instructions to suspend liquidation, retroactively and for the first time, of goods entered prior to the review and never previously suspended. *Id.* at 1343, 1344.

*AMS* is factually distinct from the present case in two meaningful ways. First, in *AMS*, Customs originally determined that the goods were *not* within the scope of the ambiguous order. Here, Customs found (correctly) that the goods *were* within the scope of the order. The CIT correctly noted that *AMS*'s holding is limited to cases "where an unclear order renders a product not subject to an existing order." *Sunpreme II CIT*, 256 F. Supp. 3d at 1292. But it would be error to include this case—in which the products were found to be subject to an existing order, even if that order was unclear—in that same category.

Second and more importantly, as a result of the original determination, Customs had *not* suspended liquidation in *AMS*. Despite that, Commerce ordered the suspension of liquidation, retroactive to even before the initiation of the scope inquiry. As we noted in *AMS*, that was a clear violation of 19 C.F.R. § 351.225(l)(2). Commerce may not suspend liquidation in a manner that causes merchandise that previously entered *not* subject to duties to be retroactively brought within the scope of duty orders. But that rule has no bearing on this case, where the goods in question entered subject to duties, have always been subject to duties, and will now continue to be subject to duties. There is nothing "retroactive" about continuing to suspend liquidation where liquidation has already been suspended for the entire relevant time period.

Indeed, subsection (l)(3) distinguishes exactly these two scenarios. When Commerce rules that a product falls within the scope of an order, but "there has been no [previous] suspension of liquidation," a new suspension must be ordered beginning only "on or after the date of initiation of the scope inquiry." 19 C.F.R. § 351.225(l)(3). Anything else would be impermissibly retroactive, as we acknowledged in *AMS*. But where, as here, a suspension that predates the scope inquiry already exists, subsection (l)(3) instead dictates that the existing suspension "will continue." *Id.* No

retroactivity concerns are raised because no new suspension occurs.

Any other outcome would run counter to the principles set forth in *AMS* itself. The *AMS* court rejected an interpretation of the scope inquiry regulations that "would permit importers to potentially avoid paying antidumping duties on past imports by asserting unmeritorious claims that their products fall outside the scope of the original order." 737 F.3d at 1344. Yet the CIT's analysis here leads to a similar result. Under the CIT's view of *AMS*, Sunpreme would be entitled to a refund of cash deposits and duties paid on goods entered between April and December 2015, as a result of its unmeritorious challenge to Commerce, even though Customs, Commerce, the CIT, and this court have all now concluded that Sunpreme's modules fall within the scope of the Orders.

The CIT separately relied on *Xerox Corp. v. United States*, 289 F.3d 792 (Fed. Cir. 2002) to conclude that Sunpreme's "goods were outside the scope of the Orders until Commerce interpreted the ambiguous scope language . . . because [Customs] lacks the authority to interpret ambiguous scope language." *Sunpreme II CIT*, 256 F. Supp. 3d at 1292. We do not agree.

*Xerox* did not address Customs's authority to take or not take any interpretive action. Rather, it presented a question of the Court of International Trade's jurisdiction: whether, under the facts of that case, the proper method of appeal was to protest to Customs, or to request a scope determination by Commerce. 289 F.3d at 793. Notably, *Xerox* did not concern an ambiguous order at all. As this court made clear in that case, "the scope of the order is not in question . . . the belts at issue are facially outside the scope of the antidumping duty order." *Id.* at 795.

It is true that, in summarizing the scope inquiry process, this court in *Xerox* described Customs's authority to "fix[] the amount of duty to be paid" as "ministerial." *Id.* at

794 (citing 19 U.S.C. § 1500(c)). We used the same term in *Mitsubishi Electronics. America, Inc. v. United States*, 44 F.3d 973, 977 (Fed. Cir. 1994), in distinguishing Customs's ministerial authority from Commerce's broader authority, noting that Customs may not "modify Commerce's determinations, their underlying facts, or their enforcement." *Id.* (quoting *Royal Bus. Machs., Inc. v. United States*, 507 F. Supp. 1007, 1014 n.18 (Ct. Int'l Trade 1980) (internal quotations and modifications omitted)). But we did not hold or state in *Xerox* or *Mitsubishi* that the "ministerial" duty of Customs excludes "interpret[ing] ambiguous scope language," *Sunpreme II CIT* at 1292, for the limited but essential purpose of making the daily, yes-or-no decisions about whether a particular product meets the test of an antidumping or countervailing duty order. The term "ministerial" often is used to contrast the presence of certain kinds of discretion or judgment. *See, e.g.*, *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 922 (2015); *Kendall v. Stokes*, 44 U.S. (3 How.) 87, 98 (1845); Black's Law Dictionary 1192 (11th ed. 2019). We need only say that we did not use the term in *Xerox* or *Mitsubishi* so narrowly as to exclude the individual product-by-product application decisions Customs is required by law to make, which do not invoke the kind of deference-deserving, boundary-defining authority reserved to Commerce when it interprets or clarifies an order during scope proceedings.

Customs is tasked with determining, for every imported product, whether the product falls within the scope of an antidumping or countervailing duty order. 19 U.S.C. § 1500(c). That necessarily entails evaluating both the product and the order. *Xerox* recognizes as much. 289 F.3d at 794 ("When merchandise may be subject to an antidumping duty order, Customs makes factual findings to ascertain what the merchandise is, and whether it is described in an order. If applicable, Customs then assesses the appropriate antidumping duty." (internal citation omitted)). In each instance, Customs is statutorily tasked with

answering a yes-or-no question as to whether the order applies, in order to fix the duty owed. When the order is ambiguous, Customs is nonetheless called upon to answer the question. As we have described, "[w]hen Customs *believes* an antidumping duty order covers a particular imported good, it suspends liquidation of that entry." *Mukand*, 502 F.3d at 1367 (emphasis added). Answering that question does not transform Customs's yes-or-no question into an interpretive act that would "modify Commerce's determinations" or otherwise impinge upon Commerce's authority to issue and set the scope of duty orders.

Finally, we address the CIT and Sunpreme's citations to *Xerox*, which in turn cites *Sandvik Steel Co. v. United States*, 164 F.3d 596 (Fed. Cir. 1998), for the proposition that "Commerce should in the first instance decide whether an antidumping order covers particular products." *Sunpreme II CIT* at 1293 (citing *Xerox*, 289 F.3d at 794–95); Appellant's Response to Petition for Rehearing, at 11. That out-of-context citation is inapplicable here. The question presented in *Sandvik* was whether an importer has properly exhausted its administrative remedies when it declines to file a scope inquiry with Commerce, but instead files a protest with Customs and in turn appeals to the CIT. This court held that such an approach was impermissible, in part because it effectively circumvented any ruling from Commerce, which "should in the first instance" rule on the scope of an antidumping duty order. *Sandvik*, 164 F.3d at 602. In other words, *Sandvik* stands for the proposition that Commerce should evaluate the scope of an order *before the issue reaches the CIT*. It does not hold that any interpretation by Customs prior to Commerce conducting a scope inquiry is invalid. Indeed, as *Xerox* notes, liquidation was suspended in *Sandvik* despite the fact that "it was unclear whether the goods at issue were within the scope of antidumping duty orders." 289 F.3d at 795 (citing *Sandvik*, 164 F.3d at 598–99). *Sandvik* did not disapprove of suspensions based on unclear orders.

For the reasons discussed above, neither *AMS* nor *Xerox* controls the outcome of this case. Under a proper reading, neither is contrary to our current holding that Customs has the authority to suspend liquidation of goods when it determines that the goods fall within the scope of an ambiguous antidumping or countervailing duty order. In the interest of clarity, however, to the extent any portions of *AMS* or *Xerox* could be read as contrary to this holding, those portions are hereby overruled.

D

In addition to being consistent with the relevant statutes, regulations, and caselaw, our holding that Customs may suspend liquidation of goods based on ambiguous duty orders elides significant policy concerns that would be created by the alternative outcome. Our decision in this case is driven by the law, and not by policy considerations. But, when a policy is declared in a statute, we must consider and "follow the policy Congress has prescribed." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018). Sunpreme's limited view of Customs's authority runs afoul of the policy declared in the Tariff Act, which instructs the government to "provide, to the maximum extent practicable, for the protection of revenue." 19 U.S.C. § 1484(a)(2)(C); *see also Guangdong Wireking Housewares & Hardware Co., Ltd v. U.S.*, 745 F.3d 1194, 1203 (Fed. Cir. 2014) ("The congressional intent behind the enactment of countervailing duty and antidumping law generally was to create a civil regulatory scheme that remedies the harm unfair trade practices cause."); *see also id.* (noting that the statutory scheme has a "curative purpose" and a "remedial intent").

Barring Customs from suspending liquidation based on ambiguous orders would create perverse incentives for importers, contrary to the remedial and revenue-driven policy of the statute. The Orders went into effect in December 2012, and imposed antidumping and countervailing duties on CSPV cells "having a p/n junction formed by any means,

whether or not the cell has undergone other processing." CVD Order, 77 Fed. Reg. at 73,017; AD Order, 77 Fed. Reg. at 73,018–19. Contrary to the Orders, Sunpreme entered its modules without depositing duties until April 2015, when Customs determined that the modules fell within the scope of the Orders and ordered the suspension of liquidation. Since then, Commerce, the CIT, a unanimous panel of this court, and now an en banc majority of this court have all also concluded that Sunpreme's modules contain "a p/n junction formed by any means." Yet, if Customs could not have lawfully suspended liquidation, Sunpreme would now receive a *refund* for duties it paid between April 2015 and December 2015.

## CONCLUSION

For the reasons stated above, we affirm the CIT's conclusion that Commerce's final scope ruling placing Sunpreme's solar products within the ambit of the Orders is supported by substantial evidence. We reverse, however, the CIT's determination that Commerce's instructions to Customs are invalid to the extent that they require continuation of suspension of liquidation and collection of cash deposits on Sunpreme's solar modules entered or withdrawn from warehouse for consumption before Commerce initiated its scope inquiry on December 30, 2015. Commerce's liquidation instructions are reinstated in full.

**AFFIRMED-IN-PART and REVERSED-IN-PART**

COSTS

Costs to the United States and SolarWorld.